[Crim. No. 3502.   Fourth Dist., Div. One.   Sept. 23, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. FRANKLIN CRUZ NABAYAN, Defendant and Appellant.

Daniel N. Busby, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

AULT, J. pro tem.*—In an indictment returned by the Grand Jury of San Diego County, Appellant Franklin Cruz Nabayan was charged with murdering Donald R. Warren, in violation of Penal Code section 187. He was tried by a jury and found guilty of murder in the second degree. Probation was denied and he was sentenced to prison for the term prescribed by law. He appeals from the judgment of conviction. The contentions made on appeal require a summarization of the evidence.

In early December 1967, Nabayan, an unemployed entertainer, had resided for approximately one month with the victim, Donald R. Warren, in Warren's rented house on Wonderland Street in Los Angeles. He did household work and driving for Warren in exchange for room and board. On the evening of December 4, 1967, Nabayan and Al Scott, who was also a friend of Warren, went to the "Body Shop," on Sunset Boulevard, and met Patricia Riley, who was employed there as a dancer. After the "Body Shop" closed, Nabayan, Scott and Miss Riley drove to the Warren residence, arriving shortly before 2:30 a.m. Warren and a male Negro were at the house. After some drinking and small talk, Scott and Miss Riley went upstairs. Shortly before 3 a.m., Warren went upstairs, got some clothes from the bedroom and stated, "We are leaving now. We'll see you in the morning." Shortly afterwards Miss Riley went downstairs and found the premises empty. A neighbor heard Nabayan state he was leaving, heard two car doors open and close and the sound of a car driving away.

At approximately 6:40 a.m., on December 5, Nabayan appeared at the emergency room of Scripps Hospital in San Diego. He was met by a nurse, Miss Pilcher, to whom he stated there was a man outside in a car who was bleeding badly and needed help. The nurse went outside with Nabayan and found Warren lying across the front seat of the car; he was unconscious and covered with blood. Nabayan helped the nurse place Warren on a gurney. He told her, after several inquiries, he had found Warren in his car along the roadside and had driven him to the hospital. Miss Pilcher testified Nabayan was well-dressed, not bloody, and did not appear

*Assigned by the Chairman of the Judicial Council.

nervous. When Nabayan was told where he could park the car, he got into the car and drove rapidly away from the hospital without identifying himself. Later three $100 bills were found in Warren's pants pocket.

A doctor saw Warren at approximately 6:40 a.m. and pronounced him dead as of that time. There were lacerations on his head; two gunshot wounds in the right forearm had broken the ulna and radius bones; four gunshot wounds in the chest and abdomen had broken several ribs and severely lacerated the spleen and liver. On autopsy, the cause of death was found to be due to bleeding in the abdomen cavity from the gunshot wounds. A blood sample was taken from Warren's body, and tests indicated a blood alcohol level of .23 percent alcohol.

Warren's car was recovered later in Los Angeles and several bullet holes and ricochet marks were found in the car. A month later, on January 6, 1968, Nabayan was stopped and arrested in Los Angeles because he was driving a car (not Warren's) which had been reported as stolen. Under the front seat of the car, the arresting officer found a loaded .357 Magnum revolver. Two of the five bullets in the gun had (X's) filed across the nose; the effect of such filing is to increase the tendency of the bullet to flatten out when it strikes an object and to do more damage. Expert testimony established Warren's wounds were inflicted by a .357 Magnum, but tests to determine whether the gun found in the car driven by Nabayan when arrested was the one used to shoot Warren were inconclusive.

Miss Erla Erlendsson testified she had known Nabayan, Warren and Al Scott. She had lived at Warren's residence on Wonderland for a few days during the time Nabayan had lived there. She had seen a pistol similar to the .357 Magnum at the residence. It was kept under a cushion of the couch in the living room. She had felt it when she sat on the couch and had lifted the cushion to see the weapon. A witness testified he had sold a .357 Magnum revolver to Al Scott about three years before the incident.

The day after his arrest, after being advised of his constitutional rights, Nabayan gave a complete statement to Sgt. Ashcraft of the San Diego Police Department. He stated that about 2:30 a.m. on December 5, Warren decided to go to San Diego and asked Nabayan to drive him there. They got into Warren's Chevrolet and Nabayan drove south on Interstate No. 5. Warren was drunk and fell asleep almost immediately.

He began to wake up as they passed by the Nuclear Power Plant (San Onofre). As they approached an off-ramp (later determined to be Interstate No. 5 and Via de la Valle, from Nabayan's description) Warren told him to turn off the freeway; he did so, turned left and drove easterly on an underpass road. Warren told him to stop the car, get out, and wait for him. Warren then drove away; he returned about 15 minutes later and honked the horn of the car. It was just then becoming daylight. When Nabayan reached the car he found Warren slumped over the wheel. Warren asked to be taken to a hospital. Nabayan drove north an undetermined distance and came to a new Shell Station where he called an ambulance. He noted then for the first time Warren was bleeding. Warren stated it would take too long to get an ambulance; instead he wanted Nabayan to take him to San Diego; Nabayan said they were a long way from San Diego; Warren then said, "Well, take me to a doctor." Nabayan then drove around for about 45 minutes looking for a doctor's house, and finally ended up on the freeway traveling toward San Diego. He saw a sign that said "Hospital"; drove to the hospital and told a nurse at the emergency entrance he had an injured man in the car. After he had helped the nurse place Warren on the gurney he got "scared and panicked" and drove away from the hospital.

Nabayan drove north, stopped at a gas station, took off his shirt, which was bloody, and put on a coat. He resumed driving north and noticed there was blood all over the inside of the car and on the windshield. He stopped at a motel, rented a $10 room, and obtained some towels to clean up the car. In doing so he found an unloaded gun with blood on it under the front passenger seat. He wrapped it up, planning to pawn it later. It was the same gun found by the police officer when Nabayan was arrested. Nabayan stated he was not aware Warren had been shot until he returned to Los Angeles and was so advised by some friends. He went to the house on Wonderland Street and removed his belongings. Between December 5 and the date of his arrest he grew a goatee.

Nabayan testified at the trial. His testimony in most respects agreed with his pretrial statement to Sgt. Ashcraft. He denied any part in the killing. He admitted two prior felony convictions.

Nabayan produced several character witnesses who testified he had a reputation for being a peaceful and quiet person. He produced expert testimony to the effect he had a passive-

dependent personality and that it was unlikely he would commit a crime such as brought about Warren's death. He made no contention he suffered from a diminished capacity by reason of mental illness or intoxication and produced no evidence upon which such a claim could be based.

In rebuttal the People presented evidence tending to show it was extremely unlikely a man with Warren's injuries would be able to drive a car, and further, the onset of shock would make a person with those injuries incapable of speech 15 or 20 minutes after the shooting. The People also presented rebuttal evidence casting doubt on the expert testimony to the effect Nabayan's personality traits were such that he could not commit the crime of murder.

Appellant contends the evidence is insufficient to support his conviction of second degree murder.     He first argues there is not sufficient evidence to connect him to the slaying. In making this argument, he points to that portion of the evidence giving rise to favorable inferences but ignores evidence supporting the finding of guilt.

Appellant was described and admitted being with Warren about the time of the killing. He fled to Los Angeles after leaving Warren at the hospital without identifying himself. He cleaned up the car to remove evidence of the killing. He immediately removed his belongings from the Wonderland premises; he grew a goatee and remained incommunicado even after learning Warren had died. At the time of his arrest, he had in his possession a .357 Magnum pistol, which he admitted he had taken from Warren's car and from which he admitted he had removed blood stains. Warren was killed by bullets fired from a .357 Magnum. Such a gun had been sold to Al Scott, a friend of appellant's, and had been seen at the residence occupied by appellant and Warren before the killing. This set of circumstances sufficiently connects appellant with the killing of Warren to support conviction by the jury. In view of them the jury was not required to believe or accept appellant's own account of what happened.

    Conceding inferences consistent with appellant's innocence do arise from parts of his own testimony and from that given by other witnesses, the test on appeal is not whether such inferences exist in the evidence but whether there is substantial evidence to support the finding of guilt. (*People* v. *Chastain,* 262 Cal.App.2d 433, 436 [68 Cal.Rptr. 765] ; *People* v. *Woolwine,* 258 Cal.App.2d 385, 388 [65 Cal. Rptr. 672].) This court may not review the evidence, resolve

conflicts or reappraise the credibility of witnesses. (*People* v. *Woolwine, supra,* p. 389; *People* v. *De Paula,* 43 Cal.2d 643, 649 [276 P.2d 600].) ▮ The prosecution produced substantial evidence proving an unlawful killing occurred and that appellant was the killer.

▮ The main thrust of appellant's claim of insufficiency is directed to the element of malice necessary to support the conviction of murder. He urges the prosecution failed to show any motivation or reason for him to murder Warren, and "there was nothing to show anger, hatred and revenge nor was there anything which showed desire for gain or anything wicked and corrupt." (App.Br., p. 30.) ▮ " 'When the killing is proved to have been committed by [appellant], and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree . . .' " (*People* v. *Wells,* 10 Cal.2d 610, 616-617 [76 P.2d 493]; see also *People* v. *Brunk,* 258 Cal.App.2d 453, 456 [55 Cal.Rptr. 747].) The burden of proving circumstances of mitigation, to lessen the degree of the crime was on appellant. (*People* v. *Wells, supra,* 10 Cal.2d 610, 617; *People* v. *Brunk, supra,* 258 Cal.App.2d 453, 456; *People* v. *Hall,* 212 Cal.App.2d 480, 482 [28 Cal.Rptr. 164].) ▮ In the instant case the presumption of malice arises from the killing itself, and since appellant relied on his denial he committed the murder and offered no evidence whatsoever in mitigation, that presumption remains unchallenged and supplies the necessary element of malice as a matter of law.

▮ Appellant assigns error to the trial court's refusal to give requested instructions on voluntary and involuntary manslaughter. ▮ Manslaughter is a lesser offense included in the crime of murder, and appellant would have been entitled to instructions covering the subject if the evidence, no matter how incredible, justified giving them under any hypothesis. (*People* v. *Carmen,* 36 Cal.2d 768, 772-774 [228 P.2d 281]; *People* v. *Modesto,* 59 Cal.2d 722, 729-731 [31 Cal.Rptr. 225, 382 P.2d 33].) ▮ The rule, however has no application to the instant case because there was no evidence, credible or incredible, upon which manslaughter instructions could have been based. Appellant's defense to the charge of murder was simply that he did not commit the act of killing Warren and was not present when the deed was done. Under this state of the record, appellant was either guilty of murder or, should the jury accept his defense of phys-

ical absence from the homicide scene, he was not guilty of any crime at all. In this circumstance, instructions on manslaughter were properly refused. (*People* v. *Sutic*, 41 Cal.2d 483, 493-494 [261 P.2d 241]; *People* v. *Alcalde*, 24 Cal.2d 177, 188 [148 P.2d 627].)

■ Appellant next contends a search of the Wonderland premises was illegal and a box of bullets found in the search should not have been received in evidence. By coincidence, Lawrence Kates, who owned the house rented by Warren, and the police met at the property on December 5, 1967, the day Warren was killed. The police informed Kates of Warren's death. Kates had leased the property to Donald Warren and a woman known as Jade Warren in August of 1967. He had not seen or had any contact with Jade Warren since September. The rent on the premises was two week's overdue and Kates had served a three-day notice to pay rent or quit on Warren on December 1, 1967. He did not take further legal steps to obtain possession of the premises. He was not aware of the fact appellant had lived in the premises with Warren. Kates entered the property and admitted the police who found the box of .357 Magnum bullets.

We need not decide whether the circumstances of Warren's death, the apparent abandonment of the premises by the cotenant, and the fact the rent had not been paid and a three-day notice to quit had been served, authorized Kates' entry into the house and his admission of the police. While appellant asserts the illegality of the search and the inadmissibility of the box of bullets, he has not indicated in any manner how receiving it in evidence prejudiced his case or contributed to his conviction. We cannot conceive it to be any part of the damning evidence which led to the finding of guilt. Independent evidence established the presence of a pistol in the house before the date of the shooting. A similar pistol was found in appellant's possession when he was arrested, and he admitted taking it from Warren's car and removing blood stains from it. Assuming *arguendo*, Kates had no legal right to enter the premises and to admit the police, we are convinced any error in allowing the box of bullets into evidence was harmless error beyond a reasonable doubt. (*Chapman* v. *California*, 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

■ Appellant finally contends the exclusion of jurors solely because of their opposition to capital punishment resulted in a guilt-oriented jury. In making this contention he

frankly acknowledges the question has heretofore been decided adversely to his position in *People* v. *Nicolaus,* 65 Cal.2d 866, 882 [56 Cal.Rptr. 635, 423 P.2d 787] and in *People* v. *Ray,* 252 Cal.App.2d 932, 948-953 [61 Cal.Rptr. 1], but urges these cases should not be controlling in the light of *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].

The Attorney General correctly points out the United States Supreme Court refused to make a similar ruling in *Witherspoon* stating: "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was." (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 516, 517 [20 L.Ed.2d 776, 782].) In *In re Anderson,* 69 Cal.2d 613, 620 [73 Cal.Rptr. 21, 447 P.2d 117], the court quoted from the above passage in *Witherspoon* and refused to allow a requested stay so a study could be carried out to determine whether exclusion of jurors opposed to capital punishment resulted in an unrepresentative jury and substantially increases the risk of conviction. It is also significant that in the numerous cases recently reversed by the California Supreme Court as to penalty under the compulsion of *Witherspoon,* none has resulted in a reversal of the guilt phase because of *Witherspoon* error. In the complete absence of proof, and in the face of the recent Supreme Court decisions, we are unable to say those who do not have conscientious scruples against the death penalty are necessarily guilt-oriented as a matter of law.

Though not urged by appellant, we note the trial court gave the second degree felony-murder instruction, recently condemned by the Supreme Court in *People* v. *Ireland* as improper, ". . . when it is based upon a felony which is an integral part of the homicide [here assault with a deadly weapon] and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged." (*People* v. *Ireland,* 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] (as modified).)

The error in giving the instruction was not prejudicial here, however, where appellant's defense was alibi and where

he presented no evidence of, and made no claim to, a diminished capacity. (*People* v. *Fain,* 70 Cal.2d 588, 598 [75 Cal.Rptr. 633, 451 P.2d 65] (as modified).)

The judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.