[Crim. No. 10354. First Dist., Div. One. Dec. 7, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES WONG et al., Defendants and Appellants.

818

## COUNSEL

LeRue J. Grim and Elfriede F. Sobiloff, under appointments by the Court of Appeal, and Michael Sobiloff for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Robert R. Granucci and Thomas A. Brady, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOLINARI, P. J.**—Defendants appeal from a judgment upon a jury verdict finding them guilty of involuntary manslaughter (Pen. Code, § 192, subd. 2) and contributing to the delinquency of a minor (Pen. Code, § 272).[1]

### The Facts

The facts most favorable to the prosecution are as follows: Alton Wong testified that on June 5, 1970, he worked as a private investigator. (In order to avoid confusion in names, Alton Wong will hereafter be referred to as "Alton.") On that date he was approached by defendants in a bar on Grant Avenue in San Francisco. Defendant Kent Louie (hereinafter "Louie"), whom Alton had met previously, asked if he could speak to him in private since he and defendant James Wong (hereinafter "Wong") were in a "little trouble." The three men proceeded to Alton's office and arrived at approximately 8:30 or 9 p.m. Louie, who did most of the talking, explained that he and Wong had picked up two girls and brought them to a downtown hotel. He stated that one of the girls was dead and the other was sick. He expressed the belief that they had taken an overdose of narcotics. Both Louie and Wong denied giving the girls any narcotics. Alton did not inquire how the girls had obtained the narcotics. He stated he could not remember the exact conversation he had with Louie and Wong but believed they had stated to him that their purpose in picking up the girls and taking them to the hotel was to have a good time and to "turn the girls on."

Alton advised defendants to consult an attorney and to then call the police. When defendants indicated that they could not find an attorney and had no money, Alton called attorney Bill Gintjee. Gintjee sent his associate Jack Wong to Alton's office, where he talked with both Louie and Wong. Alton was not present during this conversation. The attorney left, and Alton called the police and admitted them into his office.

Alton testified that he was a former federal narcotic agent; that he had asked to examine Wong's arm because Wong "was a little high"; that his eyes were constricted; that when he examined Wong's left arm he observed a fresh needle mark "about three or four days old"; and that Wong denied using narcotics. Alton stated that he did not observe any needle marks on Louie and that Louie appeared to be perfectly normal.

---

[1]The manslaughter conviction was found to be a lesser and included offense of the charge of murder (Pen. Code, § 187) and the contributing to the delinquency of a minor conviction, a misdemeanor, was found to be a lesser and included offense of the charge of furnishing a narcotic to a minor (Health & Saf. Code, § 11502).

Inspector Coreris was told that Alton had information that a body or bodies might be in a hotel room in the "South of Market area." Coreris and his partner Fotinos proceeded to Alton's office. Alton told them that Louie and Wong had been to his office and related the conversation he had had with them. Alton also informed the inspectors that Louie and Wong had talked to an attorney, and that Louie had just left to go to his home. Alton then took the inspectors to the rear of his office, where he introduced them to Wong. Wong did not appear to the officers to be under the influence of a narcotic. He related the events of the prior evening and indicated that while he and Louie were in the hotel there had been some involvement with narcotics. Wong denied knowledge of where the narcotics had been obtained. He stated that he, Louie and two girls had spent the night in the hotel and that he and Louie had checked out after paying the rent for the next day. Wong stated that he believed one girl was dead and that he was not sure about the other. After the conversation he agreed to take the inspectors to the hotel. During this conversation Wong was not placed under arrest and was not advised of his *Miranda* rights. (*Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

Wong and the inspectors proceeded to the Grand Southern Hotel at 7th and Mission Streets. They arrived at approximately midnight. Inspector Coreris examined the hotel register and found an entry for a "MM James Wong" in room 202. He obtained a key and proceeded to the room. He received no response to his knock and was unable to open the door with the key. He pounded on the door and heard what he believed to be groans coming from within the room. He then forced open the door and found a girl identified as Josephine Geli in the bed, in a semi-conscious condition. Inside a closet he discovered the body of Virginia DeBarril. He made a cursory search of the room for narcotics and paraphernalia but found none. He observed that there were numerous needle marks on the dead girl's arms. Wong was then placed under arrest for violation of Penal Code section 272 (contributing to the delinquency of a minor). While the inspector did not examine Wong's arms, it appeared to him that Wong was not under the influence of narcotics at that time. Wong was advised of his *Miranda* rights and indicated that he understood them. Wong indicated that he would talk to the police. Wong spoke "somewhat broken English" but Coreris had little difficulty in understanding him.

Wong made the following statement to Coreris: Wong and Louie had met the girls in Chinatown at approximately 9 p.m. the previous evening and they drove around the area for some time in Louie's car. At one point Miss DeBarril had bragged about how good heroin felt. They then reg-

istered at the hotel in Wong's name and shortly after entering the room the two girls injected themselves. Wong stated that Miss DeBarril probably had the heroin on her person when they registered at the hotel. He denied injecting narcotics into himself or either of the girls, and said that he did not know where the narcotics came from. Louie, Wong and the two girls then went to bed together and accomplished acts of sexual intercourse. Wong left the room the next morning, ran an errand, and then returned to the hotel at approximately 11:30 a.m. At that time he attempted to awaken Miss DeBarril, but was unsuccessful. He awakened Louie and they went to Chinatown to borrow money for another day's rent so that the body would not be discovered. They succeeded in borrowing the money, paid the room rent, and then returned to Chinatown where they contacted Alton. Wong felt that the girls had disposed of the narcotic paraphernalia in the hotel toilet.

Coreris checked the bathroom and did not find any narcotics paraphernalia. He also searched Miss Geli's clothing for narcotics and paraphernalia and found none. He did not search her person.

Coreris interviewed Louie at his home at approximately 2:30 a.m. on June 6, 1970. He gave Louie the *Miranda* warnings. Louie then stated that he and Wong had met the two girls in Chinatown at approximately 9 p.m. on June 4. They drove around in his car for awhile, and then the girls requested that they get something to "get high on." Miss DeBarril gave Louie five or ten dollars to purchase a vial of heroin. Louie and Wong purchased the vial of heroin and some paraphernalia. They registered at the hotel, the girls injected themselves, and acts of intercourse were attempted. The remainder of Louie's statement to Coreris was nearly identical to Wong's. During the conversation, Coreris did not observe any needle marks on Louie's body or that Louie was undergoing any withdrawal symptoms.

Julius Pera, the desk clerk at the hotel, testified that Wong registered at the hotel on June 5, 1970. He was accompanied by Louie and two women. All of them went up to the room. Pera placed the notation "MM" before Wong's signature and testified that none of the four had left the hotel through the lobby during his duty that day.

Dr. Robert Wright testified that he performed an autopsy on the body of Miss DeBarril and found that her death was caused by an overdose of a morphine-type drug. Examination of the decedent's right arm disclosed two needle puncture wounds of recent origin, made within 72 hours of death. There was also a needle puncture on decedent's left arm, which was also

made within 72 hours of death. In addition, there were a number of older needle marks on both arms. Toxicologist Charles Hine testified that there was a sufficient quantity of a morphine-type drug present in the body of Miss DeBarril to cause death.

It was stipulated that Miss DeBarril's date of birth was November 8, 1952.

### The Miranda *Warning and Competency of Counsel*

We first consider Wong's contention that his admissions were obtained in violation of *Miranda*. Conjunctively he asserts that he was deprived of effective assistance of counsel. The thrust of his contention is that he was given incompetent advice by the attorney he consulted and that as a result of such advice he gave the subsequent statements to the police. In this context he urges that the statements were unintelligent and involuntary.

Attorney Wong had apparently told defendant Wong to "cooperate fully with the police, take them to the area and just tell them the truth." There is little basis upon which to conclude that this advice demonstrated incompetence on the part of Wong's attorney. The knowledge or information upon which the attorney based his advice is not provided this court. Accordingly, we may not say that such advice was incompetent per se. A defendant has the burden of establishing his allegation of inadequate representation, not as a matter of speculation, but as a demonstrable reality. (*People* v. *Reeves,* 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35] [cert. den., 385 U.S. 952 (17 L.Ed.2d 229, 87 S.Ct. 332)]; *People* v. *Cram,* 12 Cal.App.3d 37, 46 [90 Cal.Rptr. 393].)

We observe that Wong's first statement to the police was made not only upon the advice of counsel but also during the investigatory stage of the police activity. Wong was not then in custody nor had the investigation focused on him as an accused. Accordingly, this interrogation did not violate *Miranda* but was merely a general questioning in the fact-finding process incident to the investigation of crime. (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 477-478 [16 L.Ed.2d 694, 725-726]; *People* v. *Superior Court,* 3 Cal.App.3d 476, 489 [83 Cal.Rptr. 771]; *People* v. *Hazel,* 252 Cal.App.2d 412, 417-418 [60 Cal.Rptr. 437].) When the investigation began to focus on Wong the police gave him the *Miranda* warning. Notwithstanding the warning, Wong gave further statements to the police. A suspect who has been given a proper *Miranda* warning may elect to speak and there is no violation of *Miranda* if the waiver of his rights is knowing and intelligent. (*People* v. *Johnson,* 70 Cal.2d 541, 558 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366] [cert. den. 395 U.S. 969

(23 L.Ed.2d 758, 89 S.Ct. 2120)]; *People* v. *Hill,* 66 Cal.2d 536, 553 [58 Cal.Rptr. 340, 426 P.2d 908] [cert. den., 389 U.S. 993 (19 L.Ed.2d 487, 88 S.Ct. 492), 390 U.S. 911 (19 L.Ed.2d 884, 88 S.Ct. 838)]; *People* v. *Brockman,* 2 Cal.App.3d 1002, 1007-1008 [83 Cal.Rptr. 70].) Defendant makes no claim of coercion on the part of the police interrogator or that the statements were made without a full awareness of his right to counsel or that his election to waive his *Miranda* rights was not intelligent. ■ The thrust of his complaint is that he received poor legal advice and that he should have been advised by his attorney not to make any statements to the police.

We apprehend, notwithstanding the abstract observation of Justice Jackson that ". . . any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances" (*Watts* v. *Indiana,* 338 U.S. 49, 59 [93 L.Ed. 1801, 1809, 69 S.Ct. 1347] [concurring opinion]), that an attorney's advice to his client to cooperate with the police and tell the truth does not per se establish ineffective representation. As already pointed out, an accused who has received a proper *Miranda* warning and who knowingly and intelligently waives his *Miranda* rights, can elect to speak to the police. This election may be made with the advice of counsel. (*People* v. *Hicks,* 4 Cal.3d 757, 762 [94 Cal.Rptr. 393, 484 P.2d 65]; *People* v. *Harrington,* 2 Cal.3d 991, 1000 [88 Cal.Rptr. 161, 471 P.2d 961] [cert. den., 402 U.S. 923 (28 L.Ed.2d 662, 91 S.Ct. 1384)]; *People* v. *Alesi,* 67 Cal.2d 856, 861 [64 Cal.Rptr. 104, 434 P.2d 360].) *Alesi* recognizes that statements to the police upon advice of counsel may be "admissions under the guiding hand of counsel" in the belief that such admissions constitute the best step that the attorney could take for his client. (At p. 861.) In the present case it is reasonable to assume that Wong gave his attorney the same version of the events in question that he gave to Alton, and that in the light of the events as narrated to him by Wong his attorney concluded that Wong could exculpate himself and avoid prosecution by cooperating with the police and telling them the truth.

■ Louie contends that admissions of Wong were obtained without first asking him if he wanted a Chinese interpreter and no warning was given him at the initial interview in Alton's office. He cites no authority for these contentions, and we would be entitled to ignore them on this basis. Presumably, he is asserting *Miranda* error. In any event, Louie has no standing to challenge the violation of Wong's *Miranda* rights. (*People* v. *Varnum,* 66 Cal.2d 808, 812 [59 Cal.Rptr. 108, 427 P.2d 772] [cert. den., 390 U.S. 529 (20 L.Ed.2d 86, 88 S.Ct. 1208)]; *People* v. *Miller,* 252 Cal.App.2d 877, 883 [60 Cal.Rptr. 791].) The basis of the warnings

required by *Miranda* is the privilege against self-incrimination and the rights it protects are violated only when the evidence obtained without the required warnings is introduced against the person whose questioning produced the evidence. (*People* v. *Varnum, supra; People* v. *Miller, supra.*) Moreover, Wong's statements were restricted to use against him and were not admitted as evidence against Louie.

It is also contended by Louie that his admissions were admitted over defense objection despite the fact that he gave no specific statement that he did not want an attorney and because he was not asked if he wanted a Chinese interpreter. Again there is no citation of authority for the contentions made and once again we apprehend that the complaint is addressed to *Miranda* error.

■ Adverting first, to the matter of the interpreter, the record does not disclose whether Louie had any difficulty with the English language at the time he gave the statement to Inspector Coreris. The record affirmatively discloses, moreover, that Louie took the stand in his own defense and testified without the benefit of or necessity for an interpreter.

■ The trial court determined that Louie was properly advised of his *Miranda* rights and that he voluntarily waived them, and there is nothing in the record indicating that Louie did not understand the admonitions given. These findings will not be set aside unless they are "palpably erroneous." (*People* v. *Daniels,* 1 Cal.App.3d 367, 374 [81 Cal.Rptr. 675]; *People* v. *Robinson,* 274 Cal.App.2d 514, 520 [79 Cal.Rptr. 213].) In the light of the whole record and "the totality of the circumstances" we conclude that such findings may not be set aside. (*Greenwald* v. *Wisconsin,* 390 U.S. 519, 521 [20 L.Ed.2d 77, 79, 88 S.Ct. 1152]; *People* v. *Johnson,* 70 Cal.2d 469, 478 [74 Cal.Rptr. 889, 450 P.2d 265]; *People* v. *Daniels, supra.*) *Miranda* does not require that an accused specifically state that he does not want an attorney. "Once the defendant has been informed of his rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows his rights and chooses not to exercise them." (*People* v. *Johnson, supra,* 70 Cal.2d 541, 558; *People* v. *Cooper,* 10 Cal.App.3d 96, 107 [88 Cal.Rptr. 919].)

### The Aranda-Bruton *Rule*

■ Wong's second contention is that the admission in evidence of Louie's statement violated the rule of *People* v. *Aranda,* 63 Cal.2d 518, 530 [47 Cal.Rptr. 353, 407 P.2d 265]. We note here that when this statement was admitted the trial judge specifically admonished the jury that

it could only be considered against Louie and that it could not be considered as evidence against Wong.

In *Aranda* certain guidelines were delineated in situations where the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant. The thrust of *Aranda* is that if the prosecution insists that it must use an extrajudicial statement and effective deletions of the portions implicating the codefendant cannot be made it should grant a severance. (63 Cal.2d at p. 530.) Here no motion for severance was made. *Aranda* holds, further, that a joint trial can be held if such implicating statements can be and are effectively deleted without prejudice to the declarant, or, if effective deletions are not possible, that the court should then exclude the entire extrajudicial statement. Here, the trial court did neither.

In *Bruton* v. *United States,* 391 U.S. 123, 127-128 [20 L.Ed.2d 476, 480-481, 88 S.Ct. 1620], the Supreme Court held that a defendant is denied his constitutional right of confrontation where the extrajudicial statement of a codefendant implicating him is admitted in evidence, and the codefendant does not take the stand, notwithstanding a clear limiting instruction to the jury that the statement is not to be considered as evidence against the defendant. The rationale of *Bruton* is that by not taking the stand the codefendant is not subject to cross-examination, thus depriving the defendant of his constitutional right of confrontation.

In *Nelson* v. *O'Neil,* 402 U.S. 622, 628-630 [29 L.Ed.2d 222, 227-229, 91 S.Ct. 1723], it was held that the *Bruton* rule does not apply where the codefendant takes the stand in his own defense and denies making an alleged out-of-court statement implicating the defendant. In the present case Louie took the stand in his own behalf and denied making the statements to Inspector Coreris. Wong had a full opportunity to cross-examine Louie. We thus have a situation analogous to that in *Nelson* where it was held that the defendant was not denied any rights protected by the Sixth and Fourteenth Amendments because of the admission in evidence of the codefendant's out-of-court statement implicating the defendant. (402 U.S. at pp. 629-630 [29 L.Ed.2d at pp. 228-229].)

■ We turn to Louie's contention that Wong's statements to Inspector Coreris were admitted in violation of *Aranda* and *Bruton* because of "improper references" to Louie. These complained-of references in no way differed from the statements Louie himself made to Coreris. Moreover, as already pointed out, the court specifically instructed and admonished the jury that Wong's statement was not to be considered as evidence against Louie.

Under *Aranda* the trial court should have effectively deleted from Wong's statement all the parts thereof implicating Louie. It could have done so without prejudice to Wong. However, although there was *Aranda* error it was not, under the facts, prejudicial to Louie. When a part of a statement that incriminates a defendant is repeated by the latter in his own statement the *Aranda* error is generally harmless. (*People* v. *Lara,* 67 Cal. 2d 365, 392-393 [62 Cal.Rptr. 586, 432 P.2d 202] [cert. den., 392 U.S. 945 (20 L.Ed.2d 1407, 88 S.Ct. 2303)]; *People* v. *Charles,* 66 Cal.2d 330, 343-344 [57 Cal.Rptr. 745, 425 P.2d 545] [cert. den., 389 U.S. 872 (19 L.Ed.2d 153, 88 S.Ct. 159)]; *People* v. *Schwartzman,* 266 Cal.App.2d 870, 887-888 [72 Cal.Rptr. 616]; *People* v. *Gant,* 252 Cal.App.2d 101, 111-112 [60 Cal.Rptr. 154].) Accordingly, in the light of the evidence properly admitted against Louie, including his own statement to Inspector Coreris, we find no reasonable probability that Louie would have received a more favorable verdict had Wong's statement been excluded or had the parts thereof incriminating Louie been deleted. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243] [cert. den., 355 U.S. 846 (2 L.Ed.2d 55, 78 S.Ct. 70)].)

 Adverting to *Bruton,* we hold that there was a violation of the rule declared in that case since Wong did not take the stand. However, under the same rationale by which the California cases have held the *Aranda* violation to be harmless, we are able to declare a belief that the *Bruton* error was harmless beyond a reasonable doubt. (*Harrington* v. *California,* 395 U.S. 250, 252-254 [23 L.Ed.2d 284, 286-288, 89 S.Ct. 1726]; *Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

### *Motion for Judgment of Acquittal*

 Wong's third contention is that the trial court erroneously denied his motion for a judgment of acquittal pursuant to Penal Code section 1118.1 which, in pertinent part, provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. . . ." The record discloses that after the prosecution rested its case in chief, Louie and Wong each moved to strike all evidence of admissions and confessions. Although no formal motion for a judgment of acquittal was made, the court considered the question and counsel for

Wong urged that Penal Code section 1118.1 applied. ▮▮▮ Under this statute a trial court must apply the same test utilized by an appellate court in reviewing a judgment of conviction, i.e., whether there is substantial evidence of the existence of each element of the offense charged. (*People v. Reilly,* 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; *People v. Groom,* 60 Cal.2d 694, 696-697 [36 Cal.Rptr. 327, 388 P.2d 359]; *People v. Valerio,* 13 Cal.App.3d 912, 919 [92 Cal.Rptr. 82].)

▮▮▮ In applying the substantial evidence rule to a motion under Penal Code section 1118.1, we must, where the trial court has denied the motion, assume in favor of its order the existence of every fact from which the jury could have reasonably deduced from the evidence whether the offense charged was committed and if it was perpetrated by the person or persons accused of the offense. (See *People v. Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911] [cert. den., 346 U.S. 827 (98 L.Ed. 352, 74 S.Ct. 47)]; *People v. Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) Accordingly, we may not set aside the trial court's denial of the motion on the ground of the insufficiency of the evidence unless it clearly appears that upon no hypothesis whatsoever is there sufficient substantial evidence to support the conclusion reached by the court below. (*People v. Daugherty, supra; People v. Newland, supra.*)

▮▮▮ We observe, too, that in determining a motion pursuant to Penal Code section 1118.1, the trial judge is entitled to consider whether, although the evidence is insufficient to establish the commission of the crime specifically charged in the accusatory pleading, the evidence is sufficient to sustain a conviction of a necessarily included offense which the evidence tends to prove. A defendant may be convicted of a lesser offense if he was charged with a felony which included the lesser offense. (Pen. Code, § 1159; *People v. McCoy,* 25 Cal.2d 177, 194 [153 P.2d 315]; *Becker v. Superior Court,* 151 Cal. 313, 317 [90 P. 689]; *People v. Doolittle,* 23 Cal.App.3d 14, 19-20 [99 Cal.Rptr. 810].) In this state two types of necessarily included offenses have been recognized: "First, where one offense cannot be committed without committing another offense, the latter offense is a necessarily included offense. [Citation.] Second, a lesser offense is necessarily included if it is within the offense specifically charged in the accusatory pleading, as distinguished from the statutory definition of the crime. [Citations.]" (*People v. St. Martin,* 1 Cal.3d 524, 536 [83 Cal.Rptr. 166, 463 P.2d 390]; *People v. Jacobs,* 27 Cal.App.3d 246, 267 [103 Cal.Rptr. 536].)

▮▮▮ In determining the propriety of the trial court's order denying the motion for acquittal we first observe that in determining the motion the

trial court could not, and did not, consider the statements given by Louie to the police since these were properly admitted as evidence against Louie only. We thus have, as against Wong at the time of the subject motion, the following evidence: Wong, together with Louie, picked up the two girls and brought them to the hotel to have a good time and to "turn the girls on"; the room was registered in Wong's name; that while they were in the hotel room the two girls injected themselves; that Wong and Louie had acts of sexual intercourse with the girls and had spent the night in the hotel with the two girls; that Wong and Louie checked out after paying the rent for the hotel for the next day; that Alton observed a fresh needle mark on Wong's arm; that Wong, when first interviewed by Coreris, stated he believed one of the girls was dead; that when the police went to the hotel room with Wong they found Miss DeBarril's body in a closet; and that her death was caused by an overdose of a morphine-type drug.

In considering the sufficiency of this evidence we first set out briefly certain principles applicable to murder and manslaughter. We first observe that in order to constitute murder of the first degree there must be evidence, direct or substantial, of a deliberate and premeditated purpose to kill or of an intent to commit a felony involved in a charge under the felony-murder doctrine; and to constitute murder of the second degree there must be evidence of an unpremeditated killing of a human being with malice or evidence of a homicide that is a direct causal result of the commission of a felony inherently dangerous to human life other than felonies coming within the purview of the felony-murder doctrine. (Pen. Code, §§ 187, 188, 189; see *People* v. *Williams,* 63 Cal.2d 452, 457 [47 Cal.Rptr. 7, 406 P.2d 647]; *People* v. *Wolff,* 61 Cal.2d 795, 819-823 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Ford,* 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892] [cert. den., 377 U.S. 940 (12 L.Ed.2d 303, 84 S.Ct. 1342)]; *People* v. *Holt,* 25 Cal.2d 59, 83-85 [153 P.2d 21].)

The only kind of manslaughter subject to consideration under the evidence adduced by the prosecution in its case in chief is involuntary manslaughter as defined in subdivision 2 of Penal Code section 192, i.e., the unlawful killing without malice "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; . . ." To be an "unlawful act" the act must be dangerous to human life or safety and meet the condition of Penal Code section 20 requiring the unity of act and intent to constitute a crime. (*People* v. *Stuart,* 47 Cal.2d 167, 173 [302 P.2d 5, 55 A.L.R.2d 705]; *People* v. *Villalobos,* 208 Cal.App.2d 321, 326 [25 Cal.Rptr. 111]; *People* v. *Rod-*

*riguez,* 186 Cal.App.2d 433, 436 [8 Cal.Rptr. 863].) The term "without due caution and circumspection" has been interpreted to be the equivalent of criminal negligence. (*People* v. *Stuart, supra.*) In order to constitute criminal negligence the conduct must be " ' "such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences." ' " (*In re Dennis M.,* 70 Cal.2d 444, 460-461 [75 Cal.Rptr. 1, 450 P.2d 296]; *People* v. *Penny,* 44 Cal.2d 861, 879 [285 P.2d 926].) A causal connection between the unlawful act or the criminal negligence and the death is essential, i.e., the death must be the probable consequence naturally flowing from the commission of the unlawful act or the criminal negligence. (*People* v. *Penny, supra,* at p. 868; *People* v. *Bernhardt,* 222 Cal.App.2d 567, 590-591 [35 Cal.Rptr. 401]; *People* v. *Rodriguez, supra,* at p. 440; *People* v. *Freudenberg,* 121 Cal.App.2d 564, 582-583 [263 P.2d 875]; *People* v. *Goodale,* 33 Cal.App.2d 80, 83 [91 P.2d 163].)

Under the state of the record we have a paucity of evidence tending to establish the elements of first or second degree murder or of the lesser and included offense of involuntary manslaughter. There is one incriminating circumstance, however, which, in connection with other facts, affords an inference of consciousness of guilt and sufficed to allow the case to go to the jury on the murder charge embraced in count one of the indictment. This circumstance is the finding of Miss DeBarril's body in a closet of the room registered to Wong and occupied by him, Louie and the two girls.

Although the record does not disclose how or in what manner Miss DeBarril's body got into the closet, an inference could reasonably be drawn that it was placed there by Wong or by both Wong and Louie. Wong told Inspector Coreris that when he returned to the hotel room at 11:30 a.m. on June 5, 1970, he tried to awaken Miss DeBarril but was unsuccessful; that he believed she was dead; that he and Louie then went to Chinatown to borrow money for another day's room rent so that the body would not be discovered; that they succeeded in borrowing the money; that they paid another day's room rent, and that they then returned to Chinatown where they contacted Alton. An inference can reasonably be drawn that the room was not occupied by any person other than Wong, Louie and the two girls. The record discloses that when Wong and Louie left the room Miss Geli was quite sick and that when she was found by the police she was in a semi-conscious condition. Accordingly, it could reasonably be inferred that she did not place the body in the closet. An inference may equally be drawn that Miss DeBarril was dead when she was placed in the closet. In sum, the jury could reasonably infer that Wong and Louie placed the

body in the closet, particularly in view of Wong's statement that he and Louie paid another day's rent so that the body would not be discovered.

An act of an accused designed to prevent arrest may afford an inference of consciousness of guilt and is receivable against him as an admission by conduct. (Witkin, Cal. Evidence (2d ed. 1966) § 511, p. 481; McCormick on Evidence, § 248, pp. 532-533; see *People* v. *Burton,* 55 Cal.2d 328, 347 [11 Cal.Rptr. 65, 359 P.2d 433]; *People* v. *Caruso,* 174 Cal.App.2d 624, 640-641 [345 P.2d 282] [cert. den., 363 U.S. 819 (4 L.Ed.2d 1517, 80 S.Ct. 1259)].) Such an act constitutes "circumstantial evidence of consciousness of guilt and hence of the fact of guilt itself." (McCormick, *supra;* see 2 Warren on Homicide, § 215, pp. 615-617; 3 Underhill's Criminal Evidence (5th ed.) § 655, pp. 1584-1587.) Accordingly, any act proving or tending to prove an effort or desire on the part of a defendant to obliterate or remove evidence of a crime as by his hiding of the decedent's body, if unexplained, warrants an inference of consciousness of guilt on his part and will be given probative force in connection with other facts as a relevant circumstance tending to show guilt. (Underhill, *supra;* 2 A.L.R. Annot., p. 1227 and cases there cited; see *Hickory* v. *United States,* 160 U.S. 408, 419, 421-422 [40 L.Ed. 474, 478-479, 16 S.Ct. 327]; *State* v. *Steele,* 190 N.C. 506, 511 [130 S.E. 308, 312]; *State* v. *Atwood,* 176 N.C. 704, 706 [97 S.E. 12, 13]; *Montgomery* v. *State,* 17 Ala.App. 469, 471 [86 So. 132, 134].)

Accordingly, acts of concealment by an accused are competent to go to the jury as tending to establish guilt. They are not, however, to be considered alone as conclusive or as creating a legal presumption of guilt, but are only circumstances to be considered and weighed with other proof and with any evidence adduced by the defendant in denial or explanation. (*Hickory* v. *United States, supra,* 160 U.S. 408, 419, 421-422; *State* v. *Atwood, supra,* 176 N.C. 704, 706 [97 S.E. 12, 13]; McCormick, *supra,* at p. 533.) Here, at the time of the motion for acquittal, the reason or motive for the concealment of Miss DeBarril's body remained unexplained except for Wong's statement that he and Louie rented the room for another day so that the body would not be discovered.

We advert now to the second count of the indictment wherein Wong was charged with unlawfully selling, furnishing, administering and giving a narcotic other than marijuana to a minor. (Health & Saf. Code, § 11502.) What we have hereinabove stated with respect to the inference of consciousness of guilt is equally applicable to this count. This circumstance, when coupled with all of the other facts adduced by the prosecution in its case in chief, including the evidence that Wong had a fresh needle

mark on his arm and Alton's testimony that Wong "was high" and his eyes were constricted, sufficed to warrant a denial of the motion for acquittal on this count. We perceive, moreover, that at the very least the evidence was sufficient at this stage to warrant a conviction of the lesser and included offense of contributing to the delinquency of a minor. Penal Code section 272 makes it a misdemeanor to commit any act which causes or tends to cause or encourage any person under the age of 18 years to come within the provisions of sections 600, 601 or 602 of the Welfare and Institutions Code.

At the time of her death Miss DeBarril was 17 years of age. Section 602 of the Welfare and Institutions Code subjects a minor who violates any law defining crime to being adjudged a ward of the court. Here the evidence adduced by the prosecution in its case in chief was ample to show that Wong, at the very least, permitted Miss DeBarril to inject herself with a narcotic in his presence and in a room rented by him. The evidence is also susceptible of the inference that he aided and encouraged her to violate the narcotic laws.

### Selection of Jury.

Wong contends that the district attorney was guilty of bad faith in selecting a "death penalty oriented" jury in that he knew that there was insufficient evidence to ever establish that defendants were guilty of first degree murder and that such a jury would deem it "unthinkable" to render a verdict of acquittal. The People contend that initially there was a possibility that a first degree murder was involved in that when the case began they intended to call Miss Geli as a witness to establish such degree. They assert that it was not until they found that they were unable to serve Miss Geli with a subpoena that first degree murder was eliminated from the case.

In *People* v. *Jenkins*, 275 Cal.App.2d 545 [80 Cal.Rptr. 257], we had occasion to consider whether a prosecutor was guilty of prejudicial misconduct in leading the jury to believe that the case was one in which the People sought the death penalty and then requested life imprisonment in his closing comments. We observed that "The implication of bad faith is countered by the possibility that until all the evidence was adduced the prosecution could not determine what penalty would be sought." (At p. 546, fn. 1.)

In any event, the contention that a "first degree or death penalty jury" is more conviction prone has been rejected. (*People* v. *Williams*, 71 Cal.2d 614, 634 [79 Cal.Rptr. 65, 456 P.2d 633]; *People* v. *Davidson*, 1 Cal.

App.3d 292, 302-303 [81 Cal.Rptr. 529]; *People* v. *Nabayan,* 276 Cal. App.2d 361, 368-369 [80 Cal.Rptr. 779].) Moreover, Wong has failed to present us with the presentation before the grand jury or the *voir dire* in the jury selection process to enable us to appraise the merit of the contention that the grand jury acted as a "rubber stamp" for the district attorney and that the jury was in fact a "death penalty oriented jury." Finally, any possible prejudice was eliminated by the court's instruction that no inferences were to be drawn for or against defendants or the People from the fact that the People had initially asked for the death penalty.

### *Misconduct of Prosecutor*

Both Wong and Louie contend that the prosecutor committed prejudicial misconduct. The applicable general rule is that in order to assert error on appeal with respect to such alleged misconduct there must be an objection and a requested admonition in the court below that the jury disregard the act done or remarks made by the prosecutor. (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913] [cert. den., 406 U.S. 971 (32 L.Ed.2d 671, 92 S.Ct. 2415)]; *People* v. *Rodriguez,* 10 Cal.App.3d 18, 35 [88 Cal.Rptr. 789]; *People* v. *Asta,* 251 Cal.App.2d 64, 86-87 [59 Cal.Rptr. 206].) Prosecutorial misconduct objected to and properly admonished does not constitute grounds for reversal except where the case is closely balanced and there is grave doubt as to the defendant's guilt or where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court. (*People* v. *Berryman,* 6 Cal.2d 331, 337 [57 P.2d 136]; *People* v. *Rodriguez, supra.*)

It is contended that the prosecutor committed prejudicial misconduct in his questioning of Louie with respect to a statement allegedly made by Louie to Alton mentioning the disposal of the body. Louie was asked: "You didn't ask [Alton] to dispose of that body for you, did you?" An objection to this question was made and immediately sustained. No admonition to the jury was requested or given. The prosecutor then asked: "Do you remember telling Inspector Coreris that you were only waiting for dark to get rid of the body?" No objection was interposed to this question. Louie denied making the statement. Although these questions were improper in that they suggested facts to the jury for which there was no evidence (see *People* v. *Graves,* 263 Cal.App.2d 719, 738 [70 Cal. Rptr. 509]), defendants may not complain on appeal. No objection was interposed to the second question. As to the first question there was an objection which was sustained but no request for an admonition.

Another question asked of Louie asserted to constitute misconduct was "Did you know that Josephine's sister is married to Donald Choy?" An objection to this question was overruled. The witness then responded "Not that I know of." We perceive no misconduct in such a question. Another question complained of occurred when Louie was asked "Do you remember telling the inspector that you eventually decided to move the body into the closet, and then you left the hotel to go to Chinatown?" No objection was interposed and Louie responded "No." Failing to object defendants have waived any objection on appeal.

We next consider the question put to Louie: "Well, what changed so that you went looking for Uncle Al?" An objection was sustained on the ground that the question contained a derogatory statement, and the jury was instructed to disregard the question. The question was rephrased to ask: "What caused you to look for Alton Wong?" No objection was made to this question. Later on in the proceedings Alton testified that Louie referred to him as "Uncle Al." Under the circumstances we see no prejudice in this questioning and conclude that any misconduct attendant the first question was cured.

The final instance of complained of misconduct occurred in a colloquy between the prosecutor and the defense attorneys. At the time, counsel for Louie was cross-examining Inspector Coreris concerning his conversation with Inspector Collins. In doing so, the prosecutor referred to Coreris' notes of the conversation, and stated that he had no objection to the introduction of the notes into evidence. The trial court, on its own motion, instructed the jury to disregard this offer and the statement. As the cross-examination continued, defense counsel asked the inspector to show him one reference in the notes. The prosecutor objected on the ground that the notes themselves were the best evidence of their content. The court stated that if the notes contained a reference to the subject matter on cross-examination the People would have the right to introduce them. The notes were offered into evidence but were not admitted. We perceive no misconduct on the part of the prosecutor.

It appears in the present case that each instance of alleged misconduct was either cured by proper objection with admonitions in some instances or waived by failure to object. We do not consider this case so closely balanced that the remarks and questions were so damaging to defendants as to be incapable of being cured by proper objection and admonition. We observe, too, that the court told the jury in its final instructions that they were not to speculate to be true any insinuations suggested by a question asked of a witness and not to speculate as to the answer to a question to

which an objection had been sustained. We perceive that the only serious instances of misconduct were the questions regarding alleged statements to Alton and Coreris concerning the disposition of the body. The effect of such misconduct was minimized in view of the evidence of Wong's statement that he had paid another day's room rent so that the body would not be discovered.

### Exhibition of Wong's Arms

Wong contends that the trial court improperly denied him the opportunity to exhibit his arms to the jury without first being sworn as a witness. Wong wished to show that he had no needle marks in order to contradict the testimony of Alton to the effect that he had a fresh needle mark the day after the homicide. The trial court refused to permit such a showing unless Wong submitted himself to cross-examination.

We perceive that if this offer was an attempt to introduce testimonial evidence it was properly refused when Wong declined to be sworn as a witness and subject himself to cross-examination. (Evid. Code, § 773.) If the offer was one of demonstrative evidence the trial court was justified in rejecting it on the basis that it was irrelevant. The arm was being offered on May 12, 1971, to show the condition of defendant's arm on June 5, 1970.

### Instructions to the Jury

Both defendants complain of the instructions and assert that as a whole they were confusing, contradictory, repetitive and in certain instances clear misstatements of the law. We examine the particular instructions complained of.

During its instructions the trial court was asked by the jury to redefine involuntary manslaughter. In response the court made the statement set out in the margin.[2] It is urged that this statement in effect told the jury that if one of defendants aided or abetted the girls in the use of

---

[2]"Now, involuntary manslaughter is likewise an unintentional killing, accidental killing, in the commission of a misdemeanor inherently dangerous to human life. [¶] And here I would say, if you find the defendants guilty of contributing, you must find the defendants guilty of involuntary manslaughter. If you find the defendants— and I am not suggesting you are going to do that—in other words, the involuntary manslaughter would arise out of the fact of the contributing. [¶] If the girls used the narcotic and there is no dispute that they used the narcotic in question, then if any defendant aided or abetted in the girls using the narcotic, aided or abetted, they became principals. . . . [¶] A person who aids and abets, or aids or abets in the use of the narcotic becomes a principal."

a narcotic, then *both* defendants became principals to the misdemeanor and, therefore, were guilty of involuntary manslaughter. In considering this contention we observe that early in its instructions the court told the jury that it would use the terms defendant and defendants interchangeably, unless otherwise indicated, and that their verdict as to each defendant must be rendered as if he were being tried separately. This was reemphasized in the court's instructions on second degree murder, on the commission of a misdemeanor inherently dangerous to human life, and in an instruction prior to the jury's retirement for deliberations. We note, also, that separate verdict forms for each defendant were given to the jury. The net effect of these instructions, when read together, do not justify the conclusion that if the jury believed one defendant aided and abetted the girls, or either of them, in their use of narcotics the jury was required to find that both defendants aided and abetted.

■■■ Another instruction which defendants contend is a misstatement of the law and prejudicial per se, occurred when the court incorrectly defined the concept of reasonable doubt. Initially in the instructions the court correctly defined the concept of reasonable doubt and the burden which rested on the People in proving their case. However, later on, the court stated, "The verdict should be, depending on your finding of the evidence, you may find them not guilty, if you are convinced beyond a reasonable doubt that they did not cause or commit an unlawful killing, . . ." However, throughout the instructions which preceded this error and those which followed the court correctly instructed the jury as to the concept of reasonable doubt and the People's burden of proof. This series of correct instructions sufficed to correct the prejudicial effect of the single misstatement in connection with the concept of reasonable doubt and the People's burden. A conflict in instructions is nonprejudicial if the jurors must have had a correct concept of the law viewing the instructions as a whole. (*People* v. *Baldwin,* 42 Cal.2d 858, 869 [270 P.2d 1028] [cert. den. 348 U.S. 937 (99 L.Ed. 734, 75 S.Ct. 358)]; *People* v. *Hardy,* 271 Cal.App.2d 322, 332 [76 Cal.Rptr. 557]; *People* v. *Chapman,* 207 Cal.App.2d 557, 577-578 [24 Cal.Rptr. 568].)

■■■ Defendants complain of the trial court's repeated emphasis in its instructions on the concept of "aiding and abetting." They contend that this emphasis was prejudicial and was not cured by the later instruction that repetition was not intended for emphasis. The complained of "overemphasis" occurred in conjunction with the trial court's attempt to place the "aiding and abetting" concept in relation to other legal terms. We observe that a basic definition of who are principals in the commission of a crime and who are aiders and abettors was first given. Later in the in-

structions the aider and abettor concept was given in relation to the instruction on the commission of a misdemeanor inherently dangerous to human life wherein the court told the jury that if either of defendants aided and abetted in the commission of such a crime he would become a principal. The last alleged instance of emphasis of the concept of "aiding and abetting" occurred when the court instructed on the offense of contributing to the delinquency of a minor. In this instruction, the court commented that anyone who aided and abetted a minor to violate the law contributes to that minor's delinquency. We perceive no undue emphasis in any of these instances reiterating the law applicable to aiders and abettors as it pertained specifically to offenses with which defendants were charged.

Defendants' next assignment of error deals with the court's instructions advising the jury that the crimes of first degree murder and voluntary manslaughter were not involved in the instant case, and then stating to the jury that if Miss DeBarril died as a result of a misdemeanor inherently dangerous to human life, voluntary manslaughter would come into play. The statements with respect to voluntary manslaughter were clearly contradictory. We perceive the latter statement to have been inadvertent and, in view of the instructions given with respect to the commission of a misdemeanor inherently dangerous to human life, that the court intended to state that the crime of *involuntary* manslaughter would come into play. The error was harmless, however, since the instructions clearly indicated to the jury that the issue of voluntary manslaughter was withdrawn from its consideration and no verdict form for a finding of voluntary manslaughter was furnished to the jury. Under these circumstances the jury was not misled and no miscarriage of justice resulted. (Cal. Const., art. VI, § 13; *People* v. *Hill,* 67 Cal.2d 105, 119 [60 Cal.Rptr. 234, 429 P.2d 586] [cert. den., 389 U.S. 1009 (19 L.Ed.2d 607, 88 S.Ct. 572)]; see *People* v. *Khan,* 41 Cal.App. 393, 397 [182 P. 803].)

Finally, defendants point out that although count two of the indictment had been amended during the course of the trial to exclude a charge of furnishing marijuana the court erred when it gave the following instruction: "Now, if you find that the defendants were not guilty of the crime of furnishing marijuana but did aid and abet in the use of marijuana, then you find the defendants guilty of involuntary manslaughter and contributing to the delinquency of a minor." Defendants contend that such instruction is unnecessary and confusing. The inclusion of this instruction was obviously incorrect since there was no evidence that marijuana was involved in the case. However, we do not think it conceivable that the jury could have been misled or that defendants were prejudiced by the instruction in view of the evidence that the only narcotic involved was

heroin. (Cal. Const., art. VI, § 13; *People* v. *Hill, supra,* 67 Cal.2d 105, 119.)

In sum, we conclude that the questionable instructions were rendered innocuous since it is clear that such instructions when read and considered with the instructions as a whole did not mislead the jury. *(People* v. *Nichols,* 255 Cal.App.2d 217, 222 [62 Cal.Rptr. 854]; *People* v. *Miller,* 185 Cal. App.2d 59, 81 [8 Cal.Rptr. 91] [cert. den., 365 U.S. 568 (5 L.Ed.2d 807, 81 S.Ct. 755)].)

### *Miss DeBarril's Age*

 Louie, relying on *People* v. *Hernandez,* 61 Cal.2d 529 [39 Cal. Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092], contends that it was error for the jury to instruct and that it was immaterial whether or not defendants knew Miss DeBarril was a minor. In *Hernandez* it was held to be reversible error to refuse to allow a defendant to present evidence that he entertained an honest and reasonable belief that the girl involved in the statutory rape charge was over the age of 18. The rationale of *Hernandez* is that an honest and reasonable belief in the existence of circumstances which, if true, would make the act for which the person is charged an innocent act is a good defense. (At pp. 535-536.)

In the present case Louie was not prevented from producing evidence of the type involved in *Hernandez* in defense of a crime charged against him, i.e., furnishing narcotics to a minor. Moreover, *Hernandez* acknowledges that "There can be no dispute that a criminal intent exists when the perpetrator proceeds with utter disregard of, or in the lack of grounds for, a belief that the female has reached the age of consent." (61 Cal.2d at p. 534.) Here Louie told the inspector that he did not know the girls' ages, but knew them from Galileo High School and knew that they still attended that school. It would appear that there was sufficient evidence to indicate that the actions which took place in the hotel room were done with "utter disregard of, or in the lack of grounds for, a belief that the female has reached the age of consent."

### *Corpus Delicti*

 Louie makes the bald assertion without reference to the record or citation of authority that ". . . there was no evidence sufficient to show corpus delicti that would allow statements and admissions to be admitted."

 "In every prosecution for crime, it is necessary to establish the *corpus delicti,* i.e., the *body* or *elements of the crime*" (1 Witkin, Cal.

Crimes (1963) § 88, p. 84; *People* v. *Lopez,* 254 Cal.App.2d 185, 188-189 [62 Cal.Rptr. 47]), and no part of it can be proved by the extrajudicial admissions or confessions of the defendant, and unless the corpus delicti is established such statements cannot be admitted in evidence. (*People* v. *Quarez,* 196 Cal. 404, 409 [238 P. 363]; *People* v. *Lopez, supra,* at pp. 189-190; *People* v. *Parker,* 122 Cal.App.2d 867, 872 [265 P.2d 933].) ▉ . The corpus delicti consists of two elements, namely, (1) the injury or loss or harm; and (2) a criminal agency causing them to exist. (*People* v. *Frey,* 165 Cal. 140, 146 [131 P. 127]; *Iiams* v. *Superior Court,* 236 Cal.App.2d 80, 82 [45 Cal.Rptr. 627].) The term "criminal agency" relates to acts in violation of law. (*People* v. *Scott,* 176 Cal.App.2d 458, 503 [1 Cal.Rptr. 600] [cert. den., 364 U.S. 471 (5 L.Ed.2d 222, 81 S.Ct. 245)].) Proof of "criminal agency" requires evidence from which it might be concluded that the injury or harm resulted from the intentional act of a human being. (*People* v. *Lopez, supra,* at p. 189; *Iiams* v. *Superior Court, supra,* at pp. 82-83.) ▉ The preliminary proof of the corpus delicti need not be "beyond a reasonable doubt" but only a slight or prima facie showing is necessary. (*People* v. *Mehaffey,* 32 Cal.2d 535, 545 [197 P.2d 12] [cert. den., 335 U.S. 900 (93 L.Ed. 435, 69 S.Ct. 399)]; *Ureta* v. *Superior Court,* 199 Cal.App.2d 672, 675 [18 Cal.Rptr. 873].) Such showing may be established by circumstantial evidence. (*People* v. *Cullen,* 37 Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Stroble,* 36 Cal.2d 615, 619 [226 P.2d 330] [affd. 343 U.S. 181 (96 L.Ed. 872, 72 S.Ct. 599)]; *People* v. *Andrews,* 222 Cal.App.2d 242, 246 [35 Cal.Rptr. 118]; *People* v. *Scott, supra,* at p. 489.) It is not necessary that the corpus delicti connect the defendant with the commission of the crime. (*People* v. *Leary,* 28 Cal.2d 740, 745 [172 P.2d 41]; *People* v. *Lopez, supra; Ureta* v. *Superior Court, supra,* at p. 675.)

In *Ureta* the deceased was found dead lying on the floor of the defendant's room with a recent puncture wound on his arm. The doctor who performed the autopsy testified that the cause of death was morphine poisoning. These facts were held by this court to establish the corpus delicti since they lead to the reasonable probable inferences that the deceased procured the narcotic from another and that it was furnished to him illegally. (199 Cal.App.2d at pp. 675-676.) The rationale of *Ureta* is that the furnishing, selling or administering of a narcotic to another is a felony (Health & Saf. Code, § 11351; Pen. Code, § 17), and that death resulting from the commission of such a felony constitutes murder of the second degree. (199 Cal.App.2d at p. 675; see *People* v. *Poindexter,* 51 Cal.2d 142, 149 [330 P.2d 763].) "The most reasonable inference is, not that deceased manufactured the narcotic which killed him himself, but that he procured it from another. . . . [¶] It is a reasonable inference

that the narcotic was also furnished or administered to him illegally." (199 Cal.App.2d at pp. 675-676.) *Ureta* also points out that it makes no difference whether the deceased or another injected the narcotic because the person who furnishes him the narcotic is liable even though the deceased did the actual administering of it. (199 Cal.App.2d at p. 676.)

The facts in the instant case, apart from the extrajudicial statements, are similar to whose which, in *Ureta,* were held to constitute the corpus delicti except that in the present case we have an additional incriminating fact warranting the inference that Miss DeBarril's death was caused by a criminal agency. That fact is the presence of her body in the closet. The most reasonable inference is not that the deceased placed herself in the closet but that she was placed there by another person.

The judgments are affirmed.

Sims, J., and Elkington, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied February 21, 1974.