[No. D011988. Fourth Dist., Div. One. Sept 26, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN RONALD BROWN, Defendant and Appellant.

COUNSEL

Steven Schorr for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Pat Zaharopoulos and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TODD, J.—A jury found John Ronald Brown guilty of four counts of unlawfully practicing medicine causing a risk of great bodily injury. (Bus. & Prof. Code, § 2053.) The trial court sentenced Brown to the upper term of three years in prison on the first count, with equal concurrent terms on the remaining counts. Brown appeals, contending (1) the evidence was insufficient to support the convictions, (2) he engaged in a single course of conduct and therefore should not have been punished for multiple counts of a single offense in violation of Penal Code section 654, (3) the trial court erred by instructing the jury it could use evidence of acts performed legally in Mexico to decide if acts performed in California violated the law, (4) the trial court erred by failing to instruct pursuant to CALJIC No. 17.01, and (5) it was error to admit the opinion testimony of an investigator from the Board of Medical Quality Assurance.

FACTS

In the spring of 1988, John Lugo, a resident of Orange County, telephoned Brown in San Diego County to discuss a possible sex change operation.

Lugo testified that Brown told him he had many years of experience in doing this type of surgery and explained the surgery to him. The two also discussed prices and it was agreed Lugo would send Brown a deposit check to freeze the current price and to guarantee a surgical date. On July 14, 1988, Lugo sent a check for $2,000 to Brown. Neither during this first conversation, nor at any point thereafter during the treatment of Lugo, did Brown inform Lugo that his license to practice medicine had been revoked in 1977 and he was not licensed to practice medicine.

After sending the check, Lugo had several telephone conversations with Brown in San Diego County. In these conversations, Lugo expressed hesitancy with going forward with the procedure because, among other reasons, he had a masculine hairline. Brown suggested a "Juri Flap" operation to alter Lugo's hairline.

Lugo met Brown in person at Brown's residence in Imperial Beach on December 31, 1988. Brown examined Lugo's scalp and thighs and told him he was a good candidate for the "Juri Flap" surgery and for a liposuction operation on his thighs. They agreed on a price and set up a tentative date for the surgeries. The surgeries were to take place in Tijuana because, Brown said, local hospitals were not receptive to sex change operations. Brown also told Lugo he planned to set up his own clinic in California with investors' money.

In subsequent telephone conversations, Brown and Lugo set January 28, 1989, as the date for the first surgery and agreed that Brown would be driving Lugo back and forth across the border. Brown gave Lugo directions to his new residence in Chula Vista. On January 28, 1989, Lugo drove to the Chula Vista residence, where Brown checked Lugo's scalp, briefly discussed the upcoming procedure and received $3,600 in cash from Lugo. Brown then drove Lugo across the border in his station wagon to the Quintana Clinic, where Brown performed the first "Juri Flap" surgery on Lugo under local anesthetic. Afterward, Brown drove Lugo back to his Chula Vista residence, where he gave Lugo Tylenol with codeine and changed the bandages on Lugo's scalp. Brown allowed Lugo to rest in the master bedroom for about one and one-half hours before he drove home to Orange County. Brown advised Lugo to wash his hair the next night and to telephone if he had any problems.

On January 30, 1989, Brown telephoned Lugo and asked if he would consent to having his next surgery filmed by a television program that wanted to do a story about Brown. Lugo agreed and they set February 11, 1989, as the date for the next surgical procedure. On February 11, Lugo went to Brown's Chula Vista residence, where he met with Brown and gave him

$1,000 in cash. Since Brown had to wait for the film crew to arrive, a person named Gary, an associate of Brown, drove Lugo to the Quintana Hospital. After Brown and the film crew arrived, Brown performed the second "Juri Flap" procedure on Lugo, which was filmed by the television crew. After the surgery, Brown and his wife drove Lugo back to the Chula Vista residence, where Brown replaced some bandages and gave Lugo Tylenol with codeine. Lugo slept for a while at the Brown residence before departing for Orange County.

On February 23, 1989, Lugo returned to Brown's Chula Vista residence, where Brown examined him and said he was a good candidate for breast implant surgery as well as a face-lift. They scheduled this surgery for February 25 and Brown wrote a letter excusing Lugo from a traffic court appearance on that ground. Because Lugo showed up at Chula Vista late on February 25, the surgery was rescheduled for February 28.

On February 28, 1989, Lugo drove to Brown's Chula Vista residence, where he paid Brown $2,700 in cash for the completion of the "Juri Flap," as well as for the liposuction, face-lift and breast implant surgery. Brown then drove Lugo to Quintana Hospital, where he performed the final "Juri Flap" procedure, the liposuction and the breast implant surgery on Lugo. Lugo awoke the next day in great pain. Brown visited Lugo in the hospital the second day following the surgery, but did not examine the bandages. On March 3, 1989, Brown drove Lugo back to the house in Chula Vista, where he examined Lugo's scalp, replaced some bandages and removed drains from between Lugo's legs. Brown gave Lugo Tylenol with codeine, as well as some purplish tablets manufactured by Lilly. Lugo remained at the house for most of the day and then drove himself to Orange County.

On March 4, 1989, Lugo telephoned Brown and told him he was having trouble walking and did not feel well. Brown told him he was going to Los Angeles the next day and would stop off in Orange County to see him. On March 5, 1989, Brown went to the residence of Lugo's parents, where he removed the bandages and stitches from Lugo's hairline and replaced the bandages around Lugo's chest. Brown also informed Lugo he would be out of the state for the next few days at a conference.

On March 8, 1989, Lugo, still not feeling well, sought treatment from a different physician. At the time of trial, Lugo had to undergo two additional operations on his scalp to clean out the infection and to remove dead transplant tissue that resulted from the surgeries performed by Brown.

Lugo sought a refund from Brown, who agreed to return $2,500 in five equal monthly installments and gave Lugo five postdated checks. In

mid-March, Lugo saw a tape of the television program on Brown and learned for the first time that Brown was not a licensed doctor in California. In April 1989, Lugo contacted Gerald McClellan, an investigator with the state Board of Medical Quality Assurance (BMQA), and agreed to participate in a sting operation to gather evidence against Brown and another physician. The sting operation never came to fruition, and, on July 26, 1989, BMQA obtained a search warrant and conducted a search of Brown's Chula Vista residence.

In a room in the residence identified by McClellan as an office, the BMQA investigators found medical and surgical equipment and supplies, medical files and charts, surgical price lists, medical correspondence and controlled substances. In McClellan's opinion, the items seized in Brown's residence were associated with someone engaged in the ongoing practice of medicine.

Dr. Matthew Gleason, a plastic surgeon, testified as an expert witness for the prosecution. Gleason testified a preoperative examination and postoperative care each constitute the practice of medicine, as well as the surgery itself. Gleason also testified Brown's preoperative examination and postoperative care of Lugo put Lugo at risk of great bodily harm and serious illness. Gleason said at the preoperative examination the physician makes a diagnosis based on the patient's history and an examination and obtains the patient's informed consent. Gleason said such preoperative care in which the physician makes the decision to go ahead with the surgery subjects the patient to the risk of suffering great bodily harm or serious physical or mental illness. Also, Gleason testified that the postoperative care is of major consequence and also subjects the patient to the same type of risks. He said a physician needs to observe the surgical wound frequently during the early phases after surgery to make sure neither problems in circulation nor infection occur.

In his defense, Brown testified he practiced medicine only in Mexico. He testified he first met Lugo in Mexico and performed all examinations and postoperative care in Mexico. Also, he testified he told Lugo he was not licensed to practice medicine in California. Brown said he kept the medical equipment in his Chula Vista residence to sterilize it there. Brown's wife testified she helped schedule surgeries for her husband through a telephone that had call-forwarding to Mexico. Brown's wife also testified Lugo was never examined or treated in California. She testified the controlled substances found in the Chula Vista house were medicines that another doctor had given her for treatment. A defense investigator testified he found Brown's receipt book at the Quintana Hospital in Tijuana.

In rebuttal, Karen MacQueen, a nurse on whom Brown had performed a sex change operation, testified that Brown told her he was licensed to practice medicine in California and Mexico.

Discussion

I

Brown contends there was insufficient evidence to support his convictions of violating Business and Professions Code section 2053, felonious unlicensed practice of medicine. The contention is without merit.

The proper test to determine a claim of insufficient evidence in a criminal case is whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) In making this determination, the appellate court " 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] . . . .' '[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record* . . . . Second, we must judge whether the evidence of each of the essential elements . . . *is substantial* . . . .' " (*Id.* at pp. 576-577, original italics.)

Although the appellate court must ensure the evidence is reasonable in nature, credible and of solid value (*People v. Johnson, supra,* 26 Cal.3d at p. 576), it must be cognizant that " 'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. . . .' " (*People v. Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)

Business and Professions Code section 2053 provides:

"Any person who willfully, *under circumstances or conditions which cause or create risk of great bodily harm, serious physical or mental illness, or death,* practices or attempts to practice, or advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked and unsuspended certificate as provided in this chapter, or without being authorized to perform that act pursuant to a certificate

obtained in accordance with some other provision of law, is punishable by imprisonment in the county jail for not exceeding one year or in the state prison.

"The remedy provided in this section shall not preclude any other remedy provided by law." (Italics added.)

 Brown argues that none of the preoperative or postoperative acts he commited in California could support the element of causing or creating a risk of great bodily harm, serious physical or mental illness or death. This argument ignores the expert testimony of Dr. Gleason, which included the following excerpts:

"Q. Now, is plastic surgery something that—what is conducted could be dangerous to the patient?

"A. Yes. Of course any surgery is dangerous. Any cutting to the skin is dangerous. Making a diagnosis is dangerous. The follow-up care is dangerous. [¶] This is why people would go to a trained physician of any kind, because they expect that the person is going to provide them an expertise which the average person doesn't have unless they have gone through the same training.

"Q. Now, as the specialist, as that plastic surgeon, if someone came to you to discuss or to have some plastic surgery done, and perhaps [it] doesn't make any difference whether it is reconstructive or cosmetic, what would be the types of procedures that you would take them through to prepare them for, to carry them through and to follow-up on the plastic surgery?

"A. First of all, of course, you would conduct the examination. The examination is divided in two parts. One is the history. You tell me what it is that is wrong or what you want. And then my examination is what I see. At the end of which we would then have a long discussion about what you wanted, what I saw and what possibly could be done as well as the alternatives and whether or not perhaps you should do it.

"This is what we call an informed consent. You have to know what I'm going to do and understand what I'm going to do and understand the risks that go along with it. I will have to tell you all the problems that can arise from it. Infection. Tissues coming apart. All of the problems that can attend any surgery."

"Q. . . . If we look at the preoperative exam, and say, for example, you say sometimes that only is an examination of [sic] consultation. Is that

possible that that could result in someone suffering serious illness or some type of great bodily harm?

"A. Yes. If, for example, I advised a person perhaps to have something done, and they had it done even though it wasn't done by me, it could lead to great bodily harm. If I did, it could lead to great bodily harm because maybe I didn't care, fully [*sic*] determine what the actual problem was.

"I think the most common thing we see where great bodily harm has come are people who have problems that are missed, rather a heart problem or a cancer, other type of a thing. So what is done or not done, once you have seen the patient you take on the task of their care. Certainly the examination is a portion that can and does lead to bodily harm.

"Q. You use the term, you take on the task of the patient's care. So that if in the preop examination you have determined to do a procedure, one elected procedure, are you setting in motion everything that transpires from that point so you can set in motion you say the risk that that person may suffer as a result of that surgery?

"Ms. Crowle [Defense Counsel]: Objection. Leading.

"The Court: Overruled. You may answer.

"The Witness: The preoperative examination is very important in that it does start, we say, the ball rolling. And that all of these things then follow as a subsequent of the examination. And in this way your preoperative examination, your discussion, your consultation leads on to the next step and therefore is important in causing harm or preventing harm." Later, Gleason discussed dangers associated with the "Juri Flap" surgery and the need for postoperative care after such surgery in the following testimony elicited by the prosecution:

"Q. Now, you say one of the dangers of performing this is that the blood supply will not fill in and that flap of skin will, in effect, die; is that correct?

"A. That is true.

"Q. And then if that happens, what kinds of dangers can happen as a result of that? [¶] Are there, in effect, dangers?

"A. Any time you have an open portion of the body, you then, of course, have a marvelous feeding place for bacteria to thrive. If they get a foothold,

of course that infection can become quite overwhelming, can of course lead to death. But at the very most that infection then can lead to further destruction.

"For example, if that flap began to lose its blood supply, if you get at it immediately, perhaps cut off that portion of the flap that is obviously dead, take immediate care of the other portions of the infected wound, then that portion of the flap will still survive and it makes it easier to proceed with your second procedure of reparation.

"But a flap or an area of the skin or the body—once it gets infected, the tissues around it begin drawing away and the infection, the bacteria which, of course, are alive can continue to thrive and enlarge this area of wound.

"Q. Does this make the postop work up, and the postop, I guess I should say, that has to be given to that very critical in the case of a Juri Flap?

"A. Yes.

"Q. Would it be, for example, appropriate, Dr. Gleason, to perform a Juri Flap, let's say on Monday, see that patient late in the afternoon after the anesthesia has worn off and send them on their way home, not to see them, for example, for two weeks or a month?

"A. No. That would be below the standard of care of anyone doing this type of surgery.

"Q. Again going back to the hypothetical presented, if you do this and excused the person and said go on your way and not see them again for a month, let's say, even would that be something that could put that person in risk of great bodily harm or serious illness?

"A. Yes, it certainly would put them in that risk." We find the expert testimony of Gleason to be reasonable in nature, credible and of solid value. It constituted substantial evidence that Brown's actions in California—the preoperative and postoperative treatment he rendered to Lugo—encompassed the element of practicing unlicensed medicine "under circumstances or conditions which cause or create risk of great bodily harm, serious physical or mental illness, or death" contained in Business and Professions Code section 2053.

Brown is simply wrong in maintaining that the requisite risk of great bodily harm is based solely on the surgery he performed in Mexico; in fact,

it was based on the preoperative and postoperative care he provided in California as well. Brown's attempt to trivialize his California conduct as merely an examination, the dispensing of some Tylenol with codeine and the changing of bandages is unpersuasive. So too is his skepticism that "the possibility of an infection, which can be readily treated with antibiotics, falls within the rubric of 'great bodily harm' contemplated by the statute."

To support his argument that the requisite risk of great bodily harm is not present, Brown relies on *People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894] and *People* v. *Sapse* (1980) 104 Cal.App.3d Supp. 1 [163 Cal.Rptr. 920]. The reliance is misplaced.

In *Burroughs, supra,* 35 Cal.3d 824, the Supreme Court analyzed Business and Professions Code section 2053 to determine if a conviction under the statute could serve as the underlying felony to support a second degree felony-murder conviction and concluded it could not.[1] In its analysis, the Supreme Court noted the statute contained the undefined term "great bodily harm," which is analogous to the term "serious bodily injury" as defined in Penal Code section 243, which sets forth punishments for the crime of battery under various circumstances. (*Id.* at p. 831.) Penal Code section 243 defines "serious bodily injury" as " '[a] serious impairment of physical condition, *including, but not limited to the following*: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement.' " (*Burroughs, supra,* 35 Cal.3d at p. 831, quoting Pen. Code, § 243, subd. (f)(5), italics added.) From this discussion in *Burroughs,* Brown argues that none of the care he provided in California subjected Lugo to the requisite risk of harm. What Brown's argument fails to take into account is the definition of "serious bodily injury" relied upon by the court in *Burroughs* is explicitly *not* an all-inclusive definition. Further, we note, as Gleason testified, postoperative infection can be life-threatening. The suggestion that such infection is not encompassed by the term "great bodily harm" in Business and Professions Code section 2053 or by the term "serious bodily injury" as defined in Penal Code section 243 is not worthy of further discussion.

In *Sapse, supra,* 104 Cal.App.3d Supp. 1, the defendant was charged with, among other things, violating then Business and Professions Code section 2142.10, now Business and Professions Code section 2054. This is a misdemeanor statute that prohibits one from holding oneself as a physician without a valid physician and surgeon's certificate. The case is simply not on point.

---

[1]Under the felony-murder rule, the underlying felony must be "inherently dangerous to human life." (*People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].)

 Brown raises as a separate contention that the trial court erred in not granting his motion pursuant to Penal Code section 1118.1[2] to dismiss the four counts of violating Business and Professions Code section 2053 at the close of the prosecution's case-in-chief. This contention also must fail on the basis of the sufficiency of the evidence test.

 In addressing a motion under Penal Code section 1118.1, "a trial court must apply the same test utilized by an appellate court in reviewing a judgment of conviction, i.e., whether there is substantial evidence of the existence of each element of the offense charged. [Citations.]

"In applying the substantial evidence rule to a motion under Penal Code section 1118.1, we must, where the trial court has denied the motion, assume in favor of its order the existence of every fact from which the jury could have reasonably deduced from the evidence whether the offense charged was committed and if it was perpetrated by the person or persons accused of the offense. [Citations.] Accordingly, we may not set aside the trial court's denial of the motion on the ground of the insufficiency of the evidence unless it clearly appears that upon no hypothesis whatsoever is there sufficient substantial evidence to support the conclusion reached by the court below. [Citations.]" (*People* v. *Wong* (1973) 35 Cal.App.3d 812, 828 [111 Cal.Rptr. 314].)

 We have reviewed the legislative history of Business and Professions Code section 2053 and find nothing to alter our construction of the statute. It clearly creates criminal liability for one whose unlicensed and unlawful diagnosis causes a risk of great bodily harm. We affirm the trial court's denial of Brown's Penal Code section 1118.1 motion.

## II

 Brown contends Penal Code section 654[3] prohibited the trial court from punishing him for four separate counts of violating Business and

---

[2]Penal Code section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

After the People had rested, the trial court granted Brown's motion for acquittal pursuant to Penal Code section 1118.1 as to three counts (counts 3, 5, and 7) of furnishing a controlled substance (Health & Saf. Code, § 11379) and one count (count 8) of grand theft (Pen. Code, § 487, subd. 1).

[3]Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such

Professions Code section 2053 since they all related to his overall treatment of Lugo and represented an indivisible course of conduct with a single ultimate objective. The contention is without merit.

■ Brown recognizes the key inquiry is whether the defendant's objective and intent attending more than one crime committed during a continuous series of events was the same, thus making it an indivisible transaction subject to only one punishment under Penal Code section 654. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905].) If there were multiple objectives not merely incidental to each other, the defendant may be punished for the independent violations even though they were parts of an otherwise indivisible course of conduct. (*People* v. *Perez* (1979) 23 Cal.3d 545, 551 [153 Cal.Rptr. 40, 591 P.2d 63].)

■ Brown argues he had but one objective, the medical treatment of Lugo, and thus he should not have been sentenced on four separate counts of violating Business and Professions Code section 2053.

It is primarily a factual question whether the acts of which a defendant is convicted constituted an indivisible transaction. (*People* v. *Nelson* (1989) 211 Cal.App.3d 634, 638 [259 Cal.Rptr. 549].) As the trial court remarked at the sentencing hearing: "The jury determined that he, on four occasions, practiced medicine without a license . . . ." The trial court apparently adopted this determination. While the court did not make an express finding that Brown's acts did not constitute an indivisible transaction, an implied find of multiple objectives inheres in the judgment. (*Ibid.*) Based on the clear evidence of Brown's practicing medicine without a license on separate occasions and receiving separate payments in connection with each occasion, the evidence supports the trial court's implied finding a different intent and objective attended each of the four counts of violating Business and Professions Code section 2053. We cannot accept Brown's argument on appeal that this case does not involve "monetary wrongdoing"; such argument totally ignores the fact that he practiced medicine in California without a license. Thus, the payments Brown received from Lugo were for his medical treatment in California as well as the surgery in Mexico.

There was no violation of Penal Code section 654 in sentencing Brown on four counts of violating Business and Professions Code section 2053.

### III

■ Brown contends the trial erred by instructing the jury as follows:

provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

"Jurisdiction. There has been evidence introduced showing that certain acts of the defendant were performed in a foreign country.

"The acts performed in that country are not against the law there. The defendant can only be found guilty for offenses that you find took place in this state.

"The acts performed in Mexico, if found to be true, may be used by you only as evidence as to what actually occurred in California.

"In other words, those foreign acts, if true, may be used by you as evidence to help you decide whether or not the acts you find were performed in California, constituted the practice of medicine in a manner causing or creating the risk of great bodily harm, serious mental or physical illness, or death." The contention is without merit.

Preliminarily, we note defense counsel did not object to this instruction at trial. Defense counsel had objected to the instruction proffered by the prosecution on the subject and the trial court refused to give the prosecution's proposed instruction. Thereafter, the trial court crafted this instruction, and the defense did not lodge an objection. Having consented at trial to the modification of the instruction, Brown cannot challenge it on appeal. (*People v. Rosoto* (1962) 58 Cal.2d 304, 355-356 [23 Cal.Rptr. 779, 373 P.2d 867], questioned on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 33 [164 Cal.Rptr. 1, 609 P.2d 468].)

Moreover, the contention must fail on its merits. Brown argues the instruction was error because a state does not impose punishment for acts done outside its territory. But the instruction does not do this; in fact, it specifically informs the jury that Brown can only be found guilty for acts that took place in California. There is no question that the acts that Brown performed in Mexico (surgery) are relevant to the acts he performed in California (preoperative and postoperative treatment). (Evid. Code, § 210.) In *People v. Buffum* (1953) 40 Cal.2d 709, 719-720 [256 P.2d 317], relied upon by Brown for the proposition that he cannot be punished for acts committed outside the state, the Supreme Court noted that "events which took place in Tijuana were, of course, relevant" in a prosecution for conspiracy to perform abortions had there been evidence of acts in California in furtherance of the agreement to perform the abortions. Here, since the Mexican surgeries were clearly relevant, the jury was properly instructed it could only use the Mexican acts to help it decide if the California acts constituted the charged crime.

## IV

■ Brown contends the trial court erred by failing to instruct the jury sua sponte that it had to unanimously agree on the criminal act or acts in accordance with CALJIC No. 17.01.[4]

■ It is well established that the entire jury must agree upon the commission of the same act in order to convict a defendant of the charged offense. (*People v. Castro* (1901) 133 Cal. 11, 13 [65 P. 13].) Where the evidence indicates the jurors might disagree as to the particular act a defendant committed, the standard unanimity instruction should be given. (*People v. Gordon* (1985) 165 Cal.App.3d 839, 855-856 [212 Cal.Rptr. 174]; see also *People v. Schultz* (1987) 192 Cal.App.3d 535, 539-540 [237 Cal.Rptr. 513].) Conversely, the failure to give CALJIC No. 17.01 does not require reversal unless "the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." (*People v. Gonzalez* (1983) 141 Cal.App.3d 786, 791 [190 Cal.Rptr. 554], disapproved on another ground in *People v. Kurtzman* (1988) 46 Cal.3d 322, 330 [250 Cal.Rptr. 244, 758 P.2d 572].) In other words, as this court has phrased it, a unanimity instruction is unnecessary "unless there is evidence based on which reasonable jurors could disagree as to which act the defendant committed." (*People v. Schultz, supra,* 192 Cal.App.3d at pp. 539-540.)

■ Moreover, it is well settled that there is another exception to the jury unanimity rule—namely, where the act or acts constituting the charged crime amount to a continuous course of conduct. (See *People v. Moore* (1986) 185 Cal.App.3d 1005, 1014 [230 Cal.Rptr. 237] [child molestation].) The crime of practicing medicine without a license is an offense which may be continuous in nature and therefore this exception to the unanimity rule may apply on occasion. (*Id.* at pp. 1014-1015.)

Turning to the facts of this case, we conclude the trial court's failure to give CALJIC No. 17.01 was not error with respect to the first count because the evidence was not such as to allow reasonable jurors to disagree as to which acts Brown committed. (*People v. Schultz, supra,* 192 Cal.App.3d at p. 540.) The first count of violating Business and Professions Code section 2053 (count 1) charged Brown with the unlicensed practice of medicine on

---

[4]CALJIC No. 17.01 provides as follows: "The defendant is accused of having committed the crime of _____ [in Count _____]. The prosecution has introduced evidence tending to prove that there is more than one [act] [or] [omission] upon which a conviction [on Count _____] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of such [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count _____ ], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict." (CALJIC No. 17.01.)

or about December 31, 1988. The only act that could support this count was the preoperative examination of Lugo at the Imperial Beach residence. As Gleason testified, a preoperative examination is the practice of medicine. Brown argues that other acts—phone conversations between Brown and Lugo and the receipt by Brown of a deposit check from Lugo—also support count one. This argument has no persuasive force since neither of these acts constitute the practice of medicine.

With respect to the remaining counts—count 2, which charged Brown with the unlicensed practice of medicine on and between January 1, 1989, and January 28, 1989; count 4, which charged Brown with the unlicensed practice of medicine on and between January 29, 1989, and February 11, 1989; and count 6, which charged Brown with the unlicensed practice of medicine on and between February 12, 1989, and March 5, 1989—in each instance Brown's acts of postoperative treatment following each of the surgeries constituted separate continuous courses of conduct. Each separate course of conduct was a separate crime, as properly charged.

Accordingly, we conclude the trial court did not err in failing to give CALJIC No. 17.01 sua sponte.

Brown also argues the trial court compounded the CALJIC No. 17.01 problem by instructing the jury it could consider evidence related to the dismissed counts "in any manner you see fit in accordance with these instructions." We disagree. As discussed above, there was no error with respect to CALJIC No. 17.01. Further, there was nothing improper with instructing the jury it could consider evidence that Brown furnished controlled substances to Lugo and received money from Lugo. Such evidence was relevant to the charges that he violated Business and Professions Code section 2053. (Evid. Code, § 210.)

V

 Brown contends the trial court erred by allowing BMQA Investigator McClellan to give opinion testimony.

Brown complains first of the following testimony:

"Q. Do you have an opinion as to the other items—and I won't, of course, name them all, but the items that were identified that were seized during the search warrant, including the documentary items, patient records, medical instruments, objects and other tools, do you have an opinion as to whether or not these are associated with the practice of medicine.

"Ms. Crowle [Defense Counsel]: Objection. Calls for conclusion.

"The Court: Overruled. You may answer.

"The Witness: Yes, I do have an opinion.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

"Ms. Crowle: Same objection.

"The Court: Same ruling. What's your answer?

"The Witness: Obviously, someone engaged in the practice of medicine. These are things that are not commonly found in anyone's home."

Brown contends this was improper opinion testimony by a lay witness, arguing that the prosecution never qualified McClellan as an expert witness. However, Brown fails to support this argument with any authority or citation to the record. Further, our reading of the record indicates that McClellan was qualified as an expert witness.

The record discloses the prosecutor elicited the following qualification testimony from McClellan:

"Q. Good afternoon, Investigator McClellan. How are you employed?

"A. I am a peace officer for the State of California employed as an investigator for the Board of Medical Quality Assurance.

"Q. What type of law enforcement background have you had prior to being an investigator for the Board of Medical Quality Assurance?

"A. As a reserve officer for San Jose Police Department for six months, enrolled at San Jose State College. I was a California Highway Patrol Officer for approximately seven-and-a-half years. I've been employed as an investigator for the parent agency, the Department of Consumer Affairs, for about 17 years.

"Q. And so the time that you have been employed with the Board of Medical Quality Assurance is included in that 17 years?

"A. That's correct.

"Q. Now, how long have you specifically worked in that division of the Department of Consumer Affairs?

"A. All of my experience with the Department of Consumer Affairs has been with the healing arts boards, primarily with the Board of Medical Quality Assurance or the Board of Medical Examiners, as it was previously known.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Q. Mr. McClellan, as an investigator with the Board of Medical Quality Assurance, what types of activities or duties do you have?

"A. Primarily to investigate problems with physicians involving quality of medical care, substance abuse, excessive prescribing, mental illness, gross negligence, gross incompetence, and I also do a lot of investigating in regard to the unlicensed practice of medicine.

"Q. And since that's obviously the area that we are talking about here, what is involved in your work in the investigating of unlicensed practice of medicine?

"A. To document the activities purportedly being done by an alleged unlicensed practitioner, to document that that individual is actually not licensed in California in any of the healing art capacities, and conduct an investigation to bring it to some sort of a conclusion."

In *People* v. *Mack* (1959) 169 Cal.App.2d 825 [338 P.2d 25], the Court of Appeal considered whether a police officer should have been qualified to give expert testimony on whether an individual was under the influence of heroin. The defense argued it was error to allow a nonmedical person to give an opinion on narcotics addiction, which is a medical matter. The Court of Appeal concluded the officer was well qualified to express an opinion on the subject, noting the following:

"The qualification of a person to testify as an expert witness is a matter within the sound discretion of the trial court; and its determination, in the absence of clear abuse, will not be disturbed by a reviewing court. [Citation.] For one to be competent to testify as an expert he must have acquired such special knowledge of the subject matter about which he is to testify, either by study or by practical experience, that he can give the trier of fact assistance and guidance in solving a problem for which his own good judgment and average knowledge is inadequate. [Citations.] Where the witness discloses special knowledge of the subject on which he undertakes to give his opinion

as an expert, the question of the degree of his knowledge goes to the weight of his testimony rather than to its admissibility. [Citations.]" (169 Cal.App.2d at pp. 830-831.) Here, McClellan had sufficient training and experience to qualify as an expert in the investigation of the unlicensed practice of medicine. The trial court was within its discretion in allowing McClellan to give the expert opinion testimony that was elicited.

■■■ Brown also complains about the following testimony by McClellan on redirect examination:

"Q. Did there—in this defendant's house, were these surgical items that you have here in court usable to perform the procedures that were listed in the bulletin board in his house?

"Ms. Crowle: Objection. Beyond the scope of cross.

"The Court: Objection overruled. You may answer.

"The Witness: They appeared to be, yes." On appeal, Brown again objects on the basis that this testimony exceeded the scope of cross-examination, which did not include any questions regarding the bulletin board list of procedures. However, during McClellan's cross-examination, defense counsel attempted to establish that the medical equipment found in Brown's residence was not the type ordinarily associated with a current medical practice. Therefore, McClellan's testimony on redirect examination did not exceed the scope of the cross-examination and was properly admitted.

DISPOSITION

Judgment affirmed.

Huffman, J., concurred.

**WIENER, Acting P. J.,** Concurring and Dissenting.—I agree with the majority except for their decision to affirm the trial court's denial of Brown's Penal Code section 1118.1 motion to dismiss count one. I believe Brown's conduct charged in that count does not constitute the aggravated circumstances required by Business and Professions Code section 2053[1] escalating his unlicensed practice of medicine to a felony. I would therefore reduce his felony conviction on that count to a misdemeanor under section 2052.

---

[1]Unless otherwise specified, all statutory references are to the Business and Professions Code.

Sections 2052 and 2053 are identically phrased except for the qualifying language added by the Legislature in 1967 when it enacted section 2141.5, the predecessor to section 2053, in order to make the unlicensed practice of medicine a felony in certain situations.

The history of former section 2141.5 reveals there was legitimate legislative concern with the inadequacy of treating criminal conduct associated with the unlicensed practice of medicine as a misdemeanor in *all* cases. Where the unlicensed person caused a risk of great bodily harm the Legislature wanted the court to be able to sentence the offender as a felon. It therefore added the phrase "who wilfully, under circumstances or conditions which cause or create risk of great bodily harm, serious physical or mental illness, or death" to the language of section 2053, making section 2053 a "wobbler," either a misdemeanor or a felony depending on the sentence imposed. This legislative intent is reflected in the reports submitted to then Governor Reagan in August 1967. Reports from the chairman of the Senate Standing Committee on Legislative Representation and from the Department of Professional and Vocational Standards both stressed the bill "would increase [the] penalty from simple misdemeanor to possible felony . . . *in aggravated circumstances*." (Italics added.) (Cal. Dept. Prof. and Vocational Stds., Enrolled Bill Rep. for Sen. Bill No. 225 (1967 Reg. Sess.) prepared for Governor Reagan (Aug. 9, 1967) [available at Cal. State Archives]; see letter from Sen. Tom Carrell to Governor Reagan (Aug. 4, 1967) regarding Sen. Bill No. 225 (1967 Reg. Sess.) [available at Cal. State Archives].) This legislative history makes equally clear, however, that the Legislature did not intend conduct which did *not* create "risk of great bodily harm, serious physical or mental illness, or death" to be treated as a felony. Implicit in its actions retaining section 2052 the Legislature determined conduct not creating an imminent risk of physical or mental harm was properly punishable as a misdemeanor.

The language of section 2053 clearly and unambiguously reflects the underlying purpose of the statute. In order for the conduct to be a felony the unlicensed person must willfully act *"under circumstances or conditions which cause or create risk of great bodily harm, serious physical . . . illness, or death."* (Italics supplied.) In other words the risk of harm must be present in the circumstances or conditions caused by the offender rather than merely having created a potential for harm at some indefinite time in the future. Had the Legislature intended that future risk of harm be treated as a felony it would have so provided.

The temporal significance of the language of section 2053 was not lost on the district attorney in this case. The charging allegations of counts two and four covered the arrangement of the first and second "Juri Flap" operations

and Lugo's postoperative care specifically referring to the periods between January 1 and January 28, 1989, and January 29 and February 11, 1989, respectively. Count six covering the period between February 12 and March 5, 1989, involved the arrangement of the breast implant and facelift operations and postoperative care. There should be no serious question that during these three relatively lengthy periods Brown placed Lugo in circumstances where Lugo faced the risk of serious physical injury.

Unlike the other charges, count I is limited to one day, December 31, 1988. Because it is charged separately we must consider Brown's conduct on that day alone to determine whether it constitutes a felony.

Limited to that day alone the evidence established Brown briefly examined Lugo's scalp, pinched his upper thighs and opined that Lugo would be a good candidate for the "Juri Flap" and liposuction procedures. Although this advice may have created the potential for later risk to Lugo if he elected to proceed with the surgeries there was nothing in the conference itself which subjected him to the present risk of bodily harm. Lugo was physically unaffected by this consultation. And after the consultation Lugo's ability to make further decisions on his medical care was neither better nor worse. Because nothing inherent in the conference itself placed Lugo in either physical or mental jeopardy I believe Brown's conduct on that day did not amount to a felony.

My view of the statute seems to be consistent with decisions in other cases. I have been unable to find any case in which a defendant was convicted of violating section 2053 where the defendant conducted himself as Brown did on December 31, 1988. To the contrary, convictions of section 2053 cases rest on substantially more invasive procedures or where the patient was placed in imminent danger. For example in *People* v. *Morgan* (1985) 177 Cal.App.3d 466 [225 Cal.Rptr. 673] the defendant injected a controlled substance into the victim and then failed to take her to the hospital. In *People* v. *Burroughs* (1984) 35 Cal.3d 824 [678 P.2d 894] the unlicensed person attempted to treat a patient suffering from leukemia.

Dr. Gleason's testimony does not cause me to reach a contrary decision. Regardless of the factual correctness of his testimony the construction and application of statutes remain questions of law to be determined by the court. (*Dean W. Knight & Sons, Inc.* v. *State of California* ex rel. *Dept. of Transportation* (1984) 155 Cal.App.3d 300, 305 [202 Cal.Rptr. 44].) There is nothing in the language of section 2053 which requires us to resort to the opinion of a medical expert. While there may be statutes couched in ambiguous or confusing terms necessitating such testimony, section 2053 is not one of them.

A petition for a rehearing was denied October 10, 1991, and appellant's petition for review by the Supreme Court was denied January 8, 1992. Mosk, J., was of the opinion that the petition should be granted.