Filed 6/10/13  P. v. Cabrera CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G045917 |
|      v. | (Super. Ct. No. 10CF0483) |
| GABRIEL MARTINEZ CABRERA, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard W. Stanford, Jr., Judge.  Affirmed.

E. Thomas Dunn, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

The main issue in this case is identification. Appellant Gabriel Martinez Cabrera contends there is insufficient evidence to support the jury's finding he was the person who heisted a cargo truck from a United Parcel Service (UPS) facility in Orange County. He also claims his attorney was ineffective for failing to present a better alibi defense. The standard of review for both claims is highly deferential. Applying those standards, we are convinced appellant's convictions for grand theft and receiving stolen property must be affirmed.

FACTS

A UPS truck full of cargo went missing from the company's Aliso Viejo distribution facility on November 10, 2008. The truck was found in Irvine the next morning, but it was empty, and its contents — valued upwards of $40,000 — were never recovered. The key to the truck was still in the ignition, and whoever drove it there must have known how to drive a stick shift because the truck has a manual transmission with a "heavy" clutch.

Investigation of the theft stalled until Albert Stanley reported he overheard his neighbor Michael Ambrose bragging about stealing a UPS truck. In February 2009, investigators searched Ambrose's computer and found a photo of appellant standing inside the doorway of a UPS truck. The truck in the photo was not the one that had been stolen, and Ambrose insisted he did not know appellant.[1] However, after investigators discovered appellant had been fired from UPS in 2007, he became a suspect. At that time, appellant's driver's license depicted him as having black hair and a mustache. He was listed as five-foot nine, 156 pounds and 39 years old.

During the course of the investigation, the police learned that three UPS employees noticed a stranger enter the Aliso Viejo facility on the night of the theft. Randy Carlson saw the man enter the facility around 6:30 p.m., which was unusual

---

[1] A convicted felon, Ambrose testified under a grant of immunity at trial.

2

because few employees arrive at that time. In a written statement to UPS for purposes of its internal investigation, he described the man as five-foot seven, with olive skin, black hair, a mustache, and wearing a brown shirt and brown pants. When the police showed Carlson a photographic lineup that included a photo of appellant, he could not make a positive identification. But he noted appellant "could be close" if he had a fuller mustache. At trial, Carlson testified he believed the suspect was wearing shorts when he saw him on the night of the theft.

UPS employee Craig Morakami also saw the suspect. In a written statement to UPS, he described the man as having a medium build and a thin mustache. In July 2010, the police showed him a photographic lineup, and he identified appellant as the suspect. At trial, Morakami testified the suspect was five-foot eight and wore a UPS uniform. He also said he would have noticed if the suspect had any facial hair because UPS policy forbids drivers from having beards.

Steve Johnson was the third UPS employee to see the suspect at the Aliso Viejo facility. In his written statement to the company, he described the man as possibly Hispanic, five-foot eight, with a mustache, and wearing a UPS jacket and hat with long pants. In July 2010, the police showed him a photo lineup and he was unable to make a positive identification. However, he said that of all the photos, appellant's was the closest to how the suspect appeared. At trial, he said he was "fairly sure" the person he picked in the lineup, i.e., appellant, was the person he saw on the night of the theft.

About an hour after the truck was stolen, UPS employee Brandon Lowe happened to come across it in a parking lot in Irvine. At the time, he did not know the truck had been stolen, but it looked odd to him because it was parked back-to-back with a U-Haul truck. Lowe approached and saw a Hispanic man and woman inside the U-Haul and a Hispanic man inside the UPS truck. The man in the UPS truck moved quickly, bending down and pivoting as he picked up and moved boxes into the U-Haul. Lowe asked the man what he was doing, and he said he was doing a "transfer." The man then

3

told the two people in the U-Haul to hurry up. Convinced nothing untoward was going on, Lowe left the scene.

Over the course of the next few days, Lowe gave a written statement to UPS and spoke to the police about what he had seen. He recalled the man in the UPS truck was Hispanic and estimated he was 35 years old, five-foot eight and 165 pounds. He also said the man had dark hair, but he did not mention anything about facial hair. At that time, the police did not know appellant was a suspect in the case. So the first two photographic lineups they showed Lowe, on November 12 and November 24, 2008, did not contain appellant's picture. Lowe did not identify anyone from those lineups.

Lowe subsequently worked with investigators to create a composite sketch of the suspect. He told the police the man he saw unloading the UPS truck was Hispanic, between five-eight and five-ten, 160 to 170 pounds, 30 to 40 years old, and had thick hair with a slight bend. Lowe indicated the man had no beard, but his face was weathered and pockmarked, and he may have had a mustache.

In January 2009, Lowe told Sheriff's Investigator Dennis Carpio the suspect had hair sticking out from under a cap, several days' growth of beard, and thick, muscular calves. Six months later, in July 2009, Carpio assembled another photographic lineup for Lowe's review, and this time he included appellant's photo in the mix. Shown this lineup, Lowe identified appellant without hesitation. At trial, Lowe said he was "very certain" appellant's photo matched the suspect. He said the suspect had a strong Hispanic accent, weathered skin with facial stubble, wore a UPS jacket and shorts, and had large, thick calves, like a typical UPS driver.

On cross-examination, Lowe admitted that, looking at appellant in the courtroom, it did not appear he had any pockmarks on his face. However, he was not asked if appellant was the person he had seen. In fact, during the trial, neither side asked any of the eyewitnesses if they recognized appellant as the suspect.

4

Investigator Carpio testified to corroborate the eyewitnesses' descriptions of appellant. He also testified appellant's appearance had changed from the time he interviewed him in 2009 to the time of trial in 2011. During the interview, appellant was sporting a mustache and had patches of dark skin on his face, but at trial, the mustache and dark patches were gone. Lowe said appellant spoke with a strong Hispanic accent during the interview, and his hair was longer back then than it was at trial.

Appellant did not testify at trial.[2] Instead, he relied on a cadre of other witnesses to establish his alibi defense. The first prong of the defense was physical incapacitation. The record shows that after appellant was fired from UPS in 2007, he hired an attorney and filed a worker's compensation claim against the company. The attorney referred appellant to Dr. Lawrence Miller, who practices in the area of chronic pain management. Beginning in February 2008, Dr. Miller examined appellant on multiple occasions. At trial, he testified appellant suffers from a variety of serious medical problems, including a fractured vertebra, a herniated disc, sciatica, and plantar fasciitis. Dr. Miller opined that, due to these conditions, appellant was in need of back surgery, and it would have been extremely painful for him to pivot, bend, or lift boxes, as Lowe described. Dr. Miller's testimony was corroborated by several of appellant's relatives, who said appellant needs to walk with a cane because of his injuries. However, none of them were able to explain how appellant sustained his injuries.

The defense also attempted to show appellant did not match the eyewitness' description of the suspect. At one point or another, the eyewitnesses said the suspect had a mustache or facial stubble, hair sticking out from under his cap, and thick, muscular calves. However, nine of appellant's relatives testified appellant was clean shaven with short hair when they saw him at a baby shower the day before the truck was stolen. The

---

2      Appellant had previously been convicted of misdemeanor theft for stealing UPS property on another occasion. Although the court ruled evidence of that prior theft could not be used to prove appellant's motive in the present case, it indicated such evidence could be used to impeach appellant if he took the stand.

defense also produced two photographs that purportedly showed appellant looking that way at the shower.  Additionally, appellant's wife testified his legs are not thick and muscular because his injuries keep him from exercising.

Lastly, the defense tried to establish appellant was having dinner with his family at the time of the theft.  Several of appellant's family members testified that, on the day of the theft, appellant took his wife, children, niece and nephew to a movie around 12:30 p.m.  Then, after the movie, they all went to appellant's mother-in-law's house in Pico Rivera for a family dinner.  However, the witnesses did not agree on when they finished dinner or when appellant left the house.

In closing argument, the prosecutor asserted the testimony of appellant's witnesses was "scripted" because before trial they were interviewed by the defense in a group setting.  The prosecution also commented on appellant's failure to present "independent" witnesses, i.e., nonrelatives, to corroborate his alibi.  Describing appellant as a disgruntled ex-employee with a motive for revenge, the prosecutor argued his alleged injuries were not so severe as to prevent him from carrying out the charged offenses.  While Dr. Miller suggested otherwise, the prosecutor argued his opinions lacked credibility because he treated appellant as part of his worker's compensation case.

In his closing argument, defense counsel asserted the prosecution's case hinged on inconsistent and unreliable eyewitness testimony.  He also argued the prosecution never produced any evidence to contradict the defense case.  In addition, defense counsel emphasized there was no physical evidence connecting appellant to the theft, and no one ever identified him in court.  However, the jury found appellant guilty as charged.  It convicted him of grand theft for stealing the truck's cargo and of receiving stolen property for concealing the truck itself.  After his motion for a new trial was denied, the court sentenced him to two years in prison.

# I

Appellant argues there is insufficient evidence to support the jury's verdict. He contends the eyewitness identification evidence was so weak and the defense case so strong that no reasonable jury could have concluded he was the person who stole the truck. We respectfully disagree.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to "'"'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence[.]"'"'" (*People v. Alexander* (2010) 49 Cal.4th 846, 917.) "Although we must ensure the evidence is reasonable, credible, and of solid value," we must keep in mind "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment . . . .' Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

In challenging the sufficiency of the evidence that was presented against him, appellant acknowledges Lowe positively identified him as the person he saw inside the stolen truck on the night of the theft. However, he claims this evidence was of dubious value because there was a "long delay" between the theft and Lowe's identification, and Lowe's description of the suspect "differed significantly" from that given by the other eyewitnesses.

Granted, eight months did pass between the theft and the time Lowe identified appellant. However, during that time, the police showed Lowe two other photographic lineups that did not contain appellant's photo. The fact Lowe did not

7

identify anyone from those first two lineups enhances the reliability of his subsequent identification of appellant. (*People v. Sanchez* (1982) 131 Cal.App.3d 718, 731, disapproved on other grounds in *People v. Escobar* (1992) 3 Cal.4th 740, 752 [reliability of photographic lineup was increased by the fact eyewitness declined to identify anyone out of a different lineup that did not contain the defendant's photo].)

Moreover, when Lowe saw appellant's photo in the third lineup, he identified him without hesitation. At trial, he said he was "very certain" the person in the photo was the person he saw on the night of the theft. Morakami also picked appellant's photograph out of a lineup. And Johnson stated that in the lineup he was shown, appellant's photo was the closest to how the suspect appeared. While he could not be certain appellant was the man he saw, he testified he was "fairly sure" about this.

Although none of the eyewitnesses identified appellant in court, they were not asked to do so: The law does not require a prior out-of-court identification to be corroborated by an in-court identification. (*People v. Cuevas* (1995) 12 Cal.4th 252.) In any event, the absence of an in-court identification in this case is not that significant in light of the evidence that appellant's appearance had changed from the time of the theft in 2008 until the time of trial in 2011. Suffice it to say, the identification evidence was fairly uniform in terms of implicating appellant in the theft.

There was also general consistency insofar as how the eyewitnesses described the suspect. They reported he was a dark haired Hispanic, about five-foot eight, with a medium build and a mustache or facial stubble. And that is how appellant appeared in his driver's license photo at the time he was arrested. Appellant claims no one other than Lowe said the suspect was wearing shorts, but in describing the suspect's clothing at trial, Carlson recalled the suspect was wearing a brown shirt, a brown hat "and I believe shorts."

There were discrepancies in the eyewitness' descriptions, and Lowe's description of the suspect as having pockmarked skin with dark patches did not match

8

how appellant looked at the time of trial. However, it was up to the jury to assess the reliability of the identification evidence and the credibility of the people who testified. And that goes for both the lay witnesses and the sole expert witness, Dr. Miller. Because Dr. Miller's assessment of appellant's physical capabilities was medically and scientifically based, appellant argues no reasonable jury could reject it. But as with all of the other testimony offered in the case, the jury was free to disregard Dr. Miller's opinions if it determined they were unreasonable or unbelievable. (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 187 [trier of fact "is free to reject even the uncontradicted testimony of an expert witness"].)

The point is, "'The strength or weakness of the identification [evidence], the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance . . . .' [Citation.]" (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 522.) On appeal, we cannot overturn a conviction simply because there are conflicts in the evidence or some of the testimony is subject to justifiable suspicion. (*People v. Elliott, supra* 53 Cal.4th at p. 585.) Instead, we can only "'set aside a jury's finding of guilt [if] the evidence of identity [is] so weak as to constitute practically no evidence at all.' [Citations.]" (*People v. Mohamed, supra*, 201 Cal.App.4th at p. 521.)

That is clearly not the situation in this case. Rather, for the reasons set forth above, we are convinced the record contains substantial evidence to support for the jury's finding appellant was the person who committed the subject offenses. We therefore reject his challenge to the sufficiency of the evidence.

9

II

Appellant also argues his attorney was ineffective for failing to put on a more compelling defense case. Again, we cannot agree.[3]

Following the verdict, appellant retained a new attorney and moved for a new trial on the grounds of insufficient evidence and ineffective assistance of counsel. In support of the motion, appellant submitted a declaration from his wife saying she supplied defense counsel with variety of evidence before trial. Appellant argued his attorney was ineffective for failing to introduce this evidence at trial because it would have corroborated his alibi defense. The subject evidence can be divided into six groups:

First, there are documents corroborating the claim that appellant and his relatives attended a baby shower the day before the theft. According to appellant's relatives, the shower was for the goddaughter of appellant's mother-in-law. Several of appellant's relatives testified they saw appellant at the shower. They said he had short hair and was clean shaven at that time. At trial, the defense also introduced two photographs which were purportedly taken at the shower. The photos are of a woman, but the defense claimed appellant could be seen standing behind her in the background. The prosecutor disputed the man in the background was appellant, and she also questioned whether the baby shower actually occurred. Although the prosecutor did not present any evidence to prove that it didn't, she suggested appellant's witnesses might have fabricated the baby shower to bolster appellant's defense.

Second, a telephone bill was intended to contradict the People's claim that appellant's wife made numerous calls on her cell phone during the time the truck was stolen. The prosecution insinuated appellant's wife was trying to communicate with

---

[3]  In a separate section of his brief, appellant also contends "no reasonable jury would have agreed to convict defendant based on the evidence presented unless it was either convinced the defense misled it about the evidence or its members were so offended by defense counsel's conduct they became biased against defendant." (Capitalization omitted.) We agree with the Attorney General that this claim, although raised under a separate heading, is part and parcel of appellant's ineffective assistance of counsel claim. We will therefore consider it in that context.

10

appellant by phone at that time. However, appellant's wife testified there would have been no reason for her to do so because appellant was with her at that time.

Third, a bank statement was offered to corroborate the defense claim that appellant went to the movies with his family on the afternoon of the theft. The statement does show a charge for a movie in Pico Rivera, but the charge is dated November 12, 2008, two days after the theft occurred. The defense claimed the charge was actually incurred on November 10 but it did not post to appellant's account until two days later.

Fourth, a marriage certificate showed appellant and his wife were married by the Catholic Church on November 8, 1997. The significance of the November date had to do with how appellant's wife claimed she was able to remember what happened on the day of the theft, which was November 10, a Monday. She said that in light of her anniversary, she took the 10th off from work and thus had a very clear memory of what she and appellant did that day. On cross-examination, she admitted she and appellant were married in a civil ceremony in June 1997. However, she said they celebrated their anniversary in November, because that is when they got married by the Catholic Church.

Fifth, medical records were produced to show appellant has never surgically altered his appearance. Because appellant's wife worked at a dermatology clinic, the prosecutor hinted it would have been easy for appellant to get work done there. However, the medical records indicated appellant never received any treatment at the clinic to change his facial characteristics.

And lastly, numerous photographs taken of appellant over the years and the composite sketch the police put together based on Lowe's description of the suspect were offered to show that appellant did not resemble the composite sketch and that his appearance remained fairly consistent over time.

The trial court did not believe defense counsel was ineffective for failing to present this evidence at trial. Describing defense counsel's preparation as "extremely thorough," the court stated, "[I]t's pretty clear that there was tons of evidence" on the

11

issue of identification and appellant's alibi. Indeed, the court believed the evidence was bordering on being cumulative, and there was a real danger of overwhelming the jury had the defense presented the evidence that was proffered by appellant's wife. Satisfied there was sufficient evidence to support the verdict and appellant received effective representation, the court denied his motion for a new trial.

"[I]n cases in which the trial court grants a new trial order, the standard of review is abuse of discretion. [Citation.] However, in cases such as this, where the trial court denied the motion for a new trial, the authorities are less clear regarding the standard of review. [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.) Some courts have utilized the abuse of discretion standard in reviewing the denial of a new trial motion based on alleged ineffective assistance of counsel. (See, e.g., *People v. Wallin* (1981) 124 Cal.App.3d 479, 483.) But others have determined that independent review is required. (See, e.g., *People v. Taylor* (1984) 162 Cal.App.3d 720, 724-726.) Not that it would make a difference here, but we believe the latter approach is more appropriate given that the right to counsel is constitutionally grounded and represents a fundamental component of our legal system. (See *In re Resendiz* (2001) 25 Cal.4th 230, 248, abrogated on another ground by *Padilla v. Kentucky* (2010) 559 U.S. 356 [in assessing ineffective assistance of counsel claim, court notes independent review is favored in cases that predominately involve questions of law, and this is "'especially so when constitutional rights are implicated'"]; *People v. Albarran, supra*, 149 Cal.App.4th

at pp. 224-225, fn. 7 [the rationale for applying independent review when a new trial motion "implicates a significant constitutional issue is inherently sound"].)[4]

Still, even with de novo review, appellant has a tough row to hoe in terms of proving his claim. """"In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.]""" (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) "Because of the difficulties inherent in making [this] evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Strickland v. Washington* (1984) 466 U.S. 668, 689.)

The defendant must also affirmatively establish prejudice. (*Strickland v. Washington, supra*, 466 U.S. at p. 687.) To do this, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) Under this standard, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

---

[4] The Attorney General argues appellant's ineffective assistance of counsel claim should have been brought by way of a habeas corpus petition rather than direct appeal because the record does not contain an explanation from trial counsel for why he tried the case the way that he did. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) However, as we have explained, appellant's ineffective assistance of counsel claim was litigated in connection with his motion for a new trial. At that hearing, the trial court considered appellant's proffered evidence and determined it would not have affected the outcome of his trial. Since the court "was able to fully determine there was adequate representation by an examination of the record . . . [n]o writ hearing was necessary." (*People v. Jones* (1981) 123 Cal.App.3d 83, 95; see also *People v. Williams* ( 2013) 56 Cal.4th 630 [where factual basis for ineffective assistance of counsel claim is litigated as part of defendant's new trial motion, court may consider that claim on direct appeal].)

13

Appellant contends his attorney was ineffective for failing to present independent evidence to corroborate the testimony his relatives provided at trial. Noting the prosecutor seized on this failure in her closing argument, appellant argues his attorney should have done more to bolster his alibi with impartial witnesses. For example, he claims his attorney should have called independent witnesses or supplied documentary evidence to prove the alleged baby shower actually took place. However, the defense presented a plethora of witnesses as well as photographic evidence to prove it did. And the prosecution did not present a whiff of evidence to prove it didn't.

Looking at the big picture, the main problem for the defense was not proving there was a baby shower. Rather, it was trying to establish appellant attended the shower and showing what he looked like at the time. Other than the two photographs the defense introduced at trial, appellant does not contend there is any other evidence his attorney could have presented on these important issues. Therefore, it wouldn't have mattered if defense counsel had presented additional evidence that the alleged baby shower actually occurred. Proving that point would not have established what appellant looked like, and that is what mattered most.

Appellant also argues he was prejudiced by his attorney's failure to corroborate various aspects of his wife's testimony, such as her claim about the family seeing a movie together on the afternoon of the theft. Appellant asserts his attorney should have produced the bank statement that was offered at the new trial motion to prove she purchased the movie tickets. However, as noted above, the statement actually shows the purchase was processed on November 12, 2008, two days after the theft. Regardless, appellant's wife testified they went to the movie in the afternoon, several hours before the theft occurred. So even if appellant did attend the movie, he still would have had time to commit the theft later that evening.

The fact is, none of the evidence that appellant proffered at the new trial motion directly related to his ability to commit the alleged offenses. Arguably, the

14

marriage certificate, phone records, medical records and photos of appellant could have been used to bolster the credibility of the appellant's wife. But even with this additional evidence, the jury still had every reason to suspect she was not being truthful in order to protect her husband. All things considered, we do not believe defense counsel was ineffective for failing to produce the subject evidence.

Appellant argues his attorney should at least have asked the court's permission to show appellant's legs to the jurors, so they could see his calves were not thick and muscular, as Lowe described them. However, appellant's wife testified to this issue, and by presenting the evidence through her, defense counsel was able to avoid the prospect of subjecting appellant to cross-examination. (*People v. Wong* (1973) 35 Cal.App.3d 812, 835.) In any event, showing appellant's calves were thin at the time of trial would not have done much to impeach Lowe's testimony because the trial did not take place until over two years after the theft occurred. That was certainly enough time for appellant's legs to diminish in terms of strength and size, especially if, as the defense claimed, he was injured and unable to exercise during that period. (See *ibid.* [exhibition of defendant's arm at time of trial was irrelevant to how it appeared 11 months earlier].)

Appellant also contends his attorney was ineffective because he offended the jury. He points to two instances where his attorney apparently raised his voice to an unacceptable level. First, while defense counsel was cross-examining Lowe, the court warned him, "Counsel, counsel, lower your voice. Keep it low." And secondly, during his closing argument, the court again told defense counsel, "Please lower your voice and keep it lowered." One of the jurors then commented, "I'm really not hard of hearing. I'm getting offended by him yelling." The prosecutor remarked on defense counsel's volume during her rebuttal, saying "we have a case proven to beyond a reasonable doubt and all the yelling and screaming isn't going to change it."

Aside from these two incidents, there is no indication the jury found defense counsel obnoxious or decided the case based on bias against him. Moreover, the

15

jury was instructed to decide the case based only on the evidence, not on bias or prejudice. (CALCRIM No. 200.) We presume the jury followed this instruction. (*People v. Morales* (2001) 25 Cal.4th 34, 47; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17].) We do not believe it is reasonably probable appellant was prejudiced because his trial counsel was perhaps a little overzealous at times and spoke too loudly on two occasions.[5]

In addition to criticizing his attorney's speaking style, appellant also belittles the substance of his arguments. He is particularly concerned about what defense counsel made in response to one of the prosecutor's statements at the end of her initial opening argument: "My burden," said the prosecutor, "is [not] to prove [the charges] beyond all doubt, [or] beyond all imaginable or speculative doubt, but to prove [them] beyond any reasonable doubt that the defendant committed this crime. There's always room for some doubt. We never even know if the sun is going to come up for sure in the morning. Japan, they don't know that right now; right? But we're pretty sure the sun is going to come up. We're pretty sure."

Replying to these comments, defense counsel began his closing argument by saying, "Boy, if you're as sure of [appellant's] guilt as you are the sun is going to come up tomorrow morning then you should find him guilty." Appellant cites this remark as proof his attorney's closing argument was unwieldy and ineffective, but we think it was a nicely constructed opening. Defense counsel vigorously attacked the prosecution's evidence and methodically addressed the weaknesses in the eyewitness' identifications. In fact, his entire argument was designed to convince the jurors that the chance appellant committed the charged offenses was actually far *less* than the odds of

---

5        Appellant also claims his attorney alienated the jury by failing to present evidence he promised in his opening statement. However, because the parties' opening arguments are not included in the record on appeal, we cannot meaningfully review this claim or find defense counsel was ineffective on this basis. (*People v. Pope* (1979) 23 Cal.3d 412, 426 [reviewing court cannot presume counsel was ineffective based on matters that are outside the record]; *People v. Neilson* (2007) 154 Cal.App.4th 1529, 1534 [where appellant fails to carry his burden of providing an adequate record on appeal to support a claim of error, the claim must be resolved against him].)

16

the sun coming up tomorrow, and therefore they should find him *not* guilty.  Even if we were inclined to second-guess the phraseology of a closing argument, this clever return of the prosecutor's argument is not one we would question.

That defense counsel was ultimately unsuccessful does not prove he was ineffective.  While it is easy to second-guess a losing strategy, we do not believe it is reasonably probable appellant would have obtained a more favorable verdict had his attorney handled the case differently.  Therefore, we do not believe appellant was denied his right to effective assistance of counsel.  No cause for reversal has been shown.

## DISPOSITION

The judgment is affirmed.

BEDSWORTH, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

IKOLA, J.

17